[ORAL ARGUMENT NOT SCHEDULED]

CONSOLIDATED NOS. 13-5293, 13-5307

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*,

PLAINTIFFS-APPELLANTS,

V.

THOMAS VILSACK,

DEFENDANT-APPELLEE

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Matthew E. Penzer
Jonathan R. Lovvorn
2100 L. St., N.W.
Washington, DC 20037
(202) 955-3669
(202) 676-2357 Facsimile
mpenzer@humanesociety.org
Counsel for Plaintiffs-Appellants

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and *Amici*.

The plaintiffs in the district court, who are appellants in this Court, are The Humane Society of the United States, Pork Producer Harvey Dillenburg, and Iowa Citizens for Community Improvement.

The defendant in the district court, appellee in this Court, is Tom Vilsack in his official capacity as Secretary of Agriculture.

There were no *amici* in the district court.

### B. Rulings Under Review.

The ruling under review is the opinion issued on September 25, 2013, by Judge Amy Berman Jackson, docket number 16, granting defendant's motion to dismiss for failing to allege Article III standing, and the accompanying order, docket number 15.

### C. Related Cases.

This case has not previously been before this Court or any other court and there are no related cases.

**D.** <u>Corporate Disclosure Statement.</u>

None of the organizational plaintiffs has a parent corporation. No publicly held company owns more than 10% of stock in any of the organizational plaintiffs.

TABLE OF CONTENTS

TABLE OF AUTHORITIES

GLOSSARY

I. JURISDICTIONAL STATEMENT ..................................................1

II. STATEMENT OF THE ISSUES...................................................2

III. STATEMENT OF THE CASE....................................................3

IV. FACTUAL BACKGROUND......................................................9

V. SUMMARY OF THE ARGUMENT ............................................15

VI. ARGUMENT......................................................................17

    A. Standard of Review...................................................17

    B. The Amended complaint Adequately Alleges
       Article III Standing....................................................19

       1. Producer Dillenburg Has Pled Article III Standing...........19

          a. Assessment-Paying Producers Have
            Particularized and Concrete Interests in a Fully
            Funded and Lawfully Executed Checkoff. ......................20

          b. The Amended Complaint Alleges Injury in Fact to
            the Plaintiffs .........................................................25

            (1) *The District Court Erred in Requiring the*
                *Amended Complaint Prove its Allegations of*
                *Harm from Diminished Checkoff Resources ............26*

            (2) *The District Court Erred in Finding*
                *Defendant's Transfer of Funds to a Lobbying*
                *Group Does Not Harm the Plaintiffs.........................34*

  c. The Amended Complaint Alleges Causation and
   Redressability because the Injuries Arise
   Directly from the Challenged Expenditures ................... 37

 2. The Amended Complaint Adequately Alleges
  Representational Standing ............................................... 42

 3. The Amended Complaint Adequately Alleges
  Organizational Standing .................................................. 44

C. Subject Matter Jurisdiction ...................................................... 49

 1. Prudential Standing ........................................................ 49

 2. All Expenditures Were Timely Challenged ........................ 50

 3. The APA is the Correct Vehicle for Review in
  the Instant Case. ............................................................ 51

CONCLUSION .................................................................................. 51

CERTIFICATE OF COMPLIANCE WITH FEDERAL
RULE OF APPELLATE PROCEDURE 32(A)(7)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006)................................................................47

*ALDF v. Glickman,*
154 F.3d 426 (D.C. Cir. 1998) (en banc)..............................................40

*Alto Dairy v. Veneman,* 336 F.3d 560 (7th Cir.2003).............................33

*\*Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dept. of Agr.,*
573 F.3d 815 (D.C. Cir. 2009)..............................................................20

*Barlow v. Collins,*
397 U.S. 159 (1970) ..............................................................................20

*Bell v. Hood,*
327 U.S. 678 (1946) ..............................................................................18

*Bennett v. Spear,*
520 U.S. 154 (1997) ..............................................................................50

*Bowen v. Michigan Academy of Family Physicians* .............................51

*\*Californians for Humane Farms v. Schafer,*
Civ. No. 08-03843-MHP, 2008 WL 4449583
(N.D.Cal., Sept. 29, 2008)...............................................35, 36, 40, 47

*\*City of Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003)......................................................18, 31

*E.E.O.C. v. St. Francis Xavier Parochial School,*
117 F.3d 621 (D.C.Cir. 1997)..............................................................18

*Edaleen Dairy, LLC v. Johanns*, 467 F.3d 778 (D.C. Cir. 2006) ............33

*Equal Rights Center v. Post Properties, Inc.,*
633 F.3d 1136 (D.C. Cir. 2011)..........................................................27

*Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012) ...................49

*Haase v. Sessions,*
835 F.2d 902 (D.C.Cir.1987)...............................................................31

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) ............46

*Herbert v. National Academy of Sciences,*
974 F.2d 192 (D.C.Cir.1992)...............................................................41

*Humane Soc'y of the U.S. v. Hodel,*
840 F.2d 45 (D.C. Cir. 1988) ..............................................................43

*Humane Soc'y of the U.S. v. U.S. Postal Serv.,*
609 F.Supp.2d 85 (D.C. Cir. 2009) .....................................................47

*Hunt v. Washington State Apple Advertising Comm'n,*
432 U.S. 333 (1977) .....................................................................42, 44

*In re Navy Chaplaincy,*
697 F.3d 1171 (D.C. Cir. 2012)......................................................19, 42

*Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.,*
402 F.3d 1249 (D.C. Cir. 2005).........................................................28

*Larson v. Valente,*
456 U.S. 228 (1982) ................................................................ 40

*Lexmark International, Inc. v. Static Control Components, Inc.,* ——
U.S. ——, 134 S.Ct. 1377 (2014) ........................................... 49

*Louisiana Energy & Power Authority v. FERC,*
141 F.3d 364 (D.C.Cir.1998) .................................................. 31

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ........................................................... 18, 19

*Mendoza v Perez,*
754 F.3d 1002 (D.C. Cir. 2014) .............................................. 49

*Permapost Products, Inc. v. McHugh,*
--- F.Supp.2d ---, 2014 WL 3056506, (D.D.C. 2014) ............... 49

*Sierra Club v. EPA,*
292 F.3d 895 (D.C.Cir.2002) .................................................. 27

*Sparrow v. United Air Lines, Inc.,*
216 F.3d 1111 (D.C. Cir. 2000) .............................................. 18

*Stark v. Wickard,* 321 U.S. 288 (1944) ....................................... 32, 33

*Warth v. Seldin,*
422 U.S. 490 (1975) .............................................................. 31

## Statutes

28 U.S.C. § 1291 ..........................................................................................1

5 U.S.C. § 702 ...............................................................................................1

5 U.S.C. § 704 .............................................................................................51

5 U.S.C. §§ 701-706 ...................................................................................14

7 U.S.C. § 4801 ........................................................................... 9, 23, 24, 35

7 U.S.C. § 4808 ................................................................................... 20, 27

*7 U.S.C. § 4809 ................................................................ 20, 27, 34, 35, 39

7 U.S.C. § 4811 ................................................................................... 20, 23

7 U.S.C. § 4812 ................................................................................... 20, 23

7 U.S.C. § 4814 ...........................................................................................51

7 U.S.C. § 4819 ..........................................................................................23

7 U.S.C. § 601 ............................................................................................32

7 U.S.C. § 7401(b)......................................................................................35

## Regulations

7 C.F.R. § 1230.58 ......................................................................................27

*7 C.F.R. § 1230.60.........................................................................24, 27, 30

*7 C.F.R. § 1230.70.........................................................................21, 24, 27

7 C.F.R. § 1230.73 ................................................................................25, 27

*7 C.F.R. § 1230.74.........................................................................25, 35, 39

7 C.F.R. § 1230.88 ......................................................................................27

7 C.F.R. Part 1230.........................................................................................9

## Rules

FRCP 12(b)(1)......................................................................................14, 50

## Other Authorities

131 Cong. Rec. S00000-04 (Nov. 20, 1985) ..............................................34

131 Cong. Rec. S00000-31 (Nov. 21, 1985) ................................................9

## <u>GLOSSARY</u>

PTOWM            PORK: THE OTHER WHITE MEAT

NPB               NATIONAL PORK BOARD

NPPC            NATIONAL PORK PRODUCERS COUNCIL

## I.  JURISDICTIONAL STATEMENT

This action seeking review of final agency action under 5 U.S.C. § 702 was filed in the district court on September 24, 2012. Defendant-Appellee moved to dismiss the action, claiming that the district court lacked subject-matter jurisdiction, on several grounds. The district court found that the amended complaint failed to allege Article III jurisdiction, and entered final judgment dismissing Plaintiff-Appellants' amended complaint on September 25, 2013. Plaintiff-Appellants filed timely notices of appeal—The Humane Society of the United States ("HSUS") filed its notice of appeal on September 25, 2013 and the remaining plaintiffs filed on October 4, 2013. This court has jurisdiction under 28 U.S.C. § 1291.

## II.  STATEMENT OF THE ISSUES

1) Whether a pork producer has alleged Article III standing to challenge decisions concerning the use of mandatory federal fees assessed to pork producers, where the complaint alleges those decisions harm plaintiffs' business interests.

2) Whether organizational plaintiffs have alleged Article III standing on their own behalves and on behalf of their pork producer members to challenge the distribution of funds for activities that impede their mission programs, where the complaint alleges that the funds were granted for the purpose of influencing legislation or government policy, in violation of federal law and regulations.

## III.  STATEMENT OF THE CASE

In this action against the Secretary of the U.S. Department of Agriculture ("Secretary"), a small pork producer and organizations who represent small pork producers seek judicial review of final agency action by the Secretary to approve a contract and make annual payments which the amended complaint alleges (1) was executed in violation of federal law and USDA regulations; and (2) resulted in the use of millions of dollars of federal pork "checkoff" funds for lobbying purposes specifically prohibited by federal law.[1]

---

[1] "Checkoff" is the commonly used term of reference for any of the various commodity research and promotion programs supervised by defendant.

The amended complaint alleges the contract and annual payments at issue – which concern the well-known "Pork: The Other White Meat" ("PTOWM") advertising intellectual property – are arbitrary and capricious and contrary to law because the Secretary approved an exorbitantly high "purchase" agreement of intellectual property using $60,000,000 of federal checkoff funds (provided by producers), JA 13, 32 (Am. Complaint ¶¶ 24, 115); because the agency negotiated the purchase in a market of zero competing buyers, JA 26 (Am. Complaint ¶ 84); because the agency used a flawed valuation process that the government deliberately refused to take possession of in order to evade FOIA disclosure, JA 22 (Am. Complaint ¶¶ 91-92); and because the agency failed to credit producers for the half billion dollars of checkoff funds used to develop value in PTOWM. JA 25 (Am. Complaint ¶¶ 79-81).

The amended complaint further alleges that, despite the availability of an opt-out clause to cancel the deal, defendant unlawfully continues to approve the transfer of millions of dollars in federal checkoff funds to a private lobbying group for large pork corporations, even *after replacing* PTOWM with an entirely new brand identity, and

thus rendering the intellectual property at issue worthless. *See* JA 28-30, 32-33 (Am. Complaint ¶¶ 99-104, 107, 116-122). The annual payment from defendant to the National Pork Producers Council ("NPPC") is approximately $3,000,000, and represents as much as 1/3 of this lobbying group's annual budget. JA 10 (Am. Complaint ¶ 13). The payments will continue for 20 years under the contract. JA 23 (Am. Complaint ¶ 71).

The amended complaint alleges how the challenged decisions harm the plaintiffs, how this harm is caused by defendant's decisions to approve the release of federal funds, and how this harm would be redressed by an order setting aside the challenged contract and enjoining further payments. The amended complaint alleges that the contract and payments harm the plaintiffs in a number of ways, including by "diminish[ing] the resources available for promotions or other legitimate programs in support of the nation's pork industry for which expenditures under the Pork Act and Pork Order are mandated," and by "prevent[ing] these mandates from being fully implemented, thereby diminishing Mr. Dillenburg's return on his compelled checkoff investment." JA 11 (Am. Complaint ¶ 15). The amended complaint

makes similar allegations of injury as to the other plaintiffs. JA 10-12 (Am. Complaint ¶¶ 14, 19-22). These injuries are directly caused by defendant's actions, are detrimental to the plaintiffs' interests regardless of how the money at issue is ultimately used, and by whom, and would be remedied by an order invalidating the contract at issue.

The amended complaint also alleges that, as a direct result of the Secretary's unlawful approvals of the contract and payments, $3,000,000 a year of federal checkoff funds "are distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his operations as an independent producer." JA 11 (Am. Complaint ¶ 16). The amended complaint further alleges injuries from defendant's continued approval of annual $3,000,000 payments to NPPC *after* PTOWM was retired from its featured promotional role in 2011, noting that this "deprives producers of the use of checkoff funds for lawful promotions and effectively gives those funds to NPPC to use in programs intended to influence legislation and government policy." JA 34 (Am. Complaint ¶ 128).

The amended complaint specifically alleges that these injuries would be at least partially redressed by invalidation of the challenged

contract and payments because "the funds at issue here provide a major source of NPPC's annual revenues, which further NPPC's programs that lobby for policies that Mr. Dillenburg believes are harmful to his interests." JA 11 (Am. Complaint ¶ 17).

Despite these specific allegations in the amended complaint, the district court held that no plaintiff had adequately pled an Article III injury or causation, and thus dismissed the action. The district court reasoned that the actions alleged to be harming plaintiffs are being carried out by the National Pork Board (which defendant controls) and NPPC, rather than defendant, thus the plaintiffs lack Article III standing. JA 61.

The district court focused most of its opinion on plaintiffs' allegations that the challenged action has resulted in the annual use of $3,000,000 of pork producers' money by NPPC for lobbying detrimental to the plaintiff small farmers. The court reasoned that "[w]hat is unlawful under the statute here is the Pork Board's use of the checkoff funds for lobbying purposes," but since the actual on-the-ground lobbying is being carried out by an entity illegally funded by the Pork Board (rather than the Board itself), the plaintiffs' have no standing to

6

challenge the defendant's explicit approval of the Pork Board's decision. JA 61. ("Even if the Secretary's challenged approvals of the Pork Board's expenditures enabled NPPC to receive the funds and use them in this manner, NPPC's lobbying is completely lawful." JA 61.)

In essence, the district court's ruling will result in a situation where if a federal agency is prohibited from using federal funds for a specific purpose, it can simply grant such funds to a private entity to use them contrary to statute, and parties aggrieved by that funding cannot obtain judicial review of the agency's decision because the *coup de grâce* of the harm to plaintiffs is delivered by a cooperating third party. At the pleading stage, allegations of a causal link should not be so easily severed.

The court also dismissed plaintiffs' allegations of direct injuries flowing from defendant's unlawful approval of the contract at issue. The court conceded that the amended complaint alleged that, if plaintiffs are correct on the merits, the challenged decision unquestionably removes $3,000,000 annually from the pool of funds otherwise available for lawful activities that would benefit plaintiffs. JA 46, 51, 61. The court also appeared to recognize that plaintiffs have alleged that their

7

"interest in the return on checkoff funds is 'not possessed by the people generally' because members of the public do not pay assessments to the Pork Board, and they therefore have no interest in the return." JA 53.

The court nevertheless held, based on materials outside the amended complaint, that the amended complaint's allegations that the challenged decision harms plaintiffs' business interests are factually wrong, JA 54, and that the case should be dismissed at the pleading stage because plaintiffs "failed to provide any facts to support his conclusion that the return on his assessment would have been higher if the Board had spent the $3 million annual payments in some other unspecified manner" – *i.e.,* in a manner consistent with federal law and regulations. JA 55. The court's ruling apparently discounted the amended complaint's allegations that the challenged expenditures are arbitrary and capricious, and that diverting any funds to lobbying uses removes them from revenue-making promotional uses that benefit plaintiffs. JA 10-12, 31-34 (Am. Complaint ¶¶ 14, 15, 19-22, 111-129). Nor did the court address the fact that, since 2011 (when use of the PTOWM ceased being used in feature pork promotion), plaintiffs and other pork producers were essentially paying $3,000,000 per year in

8

return for effectively *nothing* of value. JA 32-34 (Am. Complaint ¶¶ 116-129). This appeal followed.

## IV.  FACTUAL BACKGROUND

The case begins with the Pork Promotion, Research, and Consumer Information Act ("Pork Act"), 7 U.S.C. §§ 4801-4819, which established what the legislation's sponsor described as "a self-help program for pork producers to be operated at no cost to the Nation's taxpayer." 131 Cong. Rec. S00000-31 (Nov. 21, 1985).[2] The Pork Act authorized the establishment of "an orderly procedure" for funding and carrying out a program of promotion, research, and consumer information. 7 U.S.C.A. § 4801.

That orderly procedure was promulgated in the Pork Order, 7 C.F.R. Part 1230, which declared the rules by which the program would be conducted in order to achieve its purpose. Based on their economic interests in the benefits of the program, in 1988, producers voted to adopt the Pork Order and accept the financial burdens of financing the

---

[2] The Pork Act and Order also apply to importers. Because no importers are directly involved in this case, plaintiffs will refer only to "producers" in this brief.

program. As a result, every commercial pork producer or importer has a mandatory duty to pay an assessment to the National Pork Board on every pork sale, but these funds may only be expended for limited purposes and according to strict guidelines established by the Pork Act and Order. JA 13-15 (Am. Complaint ¶¶ 24, 27-35).

After it was first established in 1986, one of the first moves the Pork Board made was to adopt PTOWM as its brand identity. JA 18 (Am. Complaint ¶ 46). The slogan had been developed by the Bozell advertising agency in anticipation of pitching it to the newly formed checkoff program and landing its lucrative budget. JA 18-19 (Am. Complaint ¶¶ 46-50).

Also involved in the activities at this time was NPPC, which had called for advertising slogan pitches in anticipation of working as a contractor for the new checkoff program. The Board approved 4.5 million federal checkoff dollars at the proposal meeting to fund the initial promotional campaign of PTOWM. JA 18-19 (Am. Complaint ¶ 50). PTOWM continued to be the Board's primary advertising message each year from its inception through 2006, all paid for entirely from Pork Act assessments funded by producers, at a total cost of more than

half a billion dollars. JA 6, 19 (Am. Complaint ¶¶ 1, 54). NPPC was the Board's primary contractor throughout this period, as well. JA 18-20 (Am. Complaint ¶¶ 50, 55).

In 1999, a hitch in the Board's relationship with NPPC developed. An Inspector General audit found that the Pork Board had relinquished too much authority to NPPC and "has placed the NPPC in a position to exert undue influence over Board budgets and grant proposals." JA 19-20 (Am. Complaint ¶ 55). After years of working virtually side-by-side, in 2001 NPPC was forced to "separate" from the Pork Board. JA 20 (Am. Complaint ¶ 58). The separation left NPPC in financial jeopardy and in desperate need of a steady revenue stream, which the Pork Board immediately began working with NPPC to find a way to secure. JA 21-22 (Am. Complaint ¶¶ 60-63).

In 2004, the Pork Board and NPPC found the lobbying revenue stream they were searching for in the PTOWM intellectual property. NPPC had claimed ownership of PTOWM, although it had been created specifically in anticipation of the new checkoff program in 1986, and promoted entirely with federal checkoff funds from the start. JA 18-19, 25 (Am. Complaint ¶¶ 46- 54, 79-80). In 2004, the Pork Board agreed to

11

increase its annual license fee for PTOWM from one dollar to $818,000. Board CEO Steve Murphy wrote at the time that the increase would "allow the NPPC to get the money they need for the next four years." JA 21-22 (Am. Complaint ¶ 63).

Just two years later, the Pork Board again increased its annual payment, this time by executing a purchase agreement that would provide $3,000,000 annually to NPPC for twenty years. JA 23 (Am. Complaint ¶ 71). This purchase was made amidst glaring business and accounting standards deficiencies and in violation of the Pork Act, the Pork Order, and AMS Guidelines. JA 22-28 (Am. Complaint ¶¶ 66-98). Plaintiffs allege in Count I that the approval of the purchase agreement and each annual payment thereafter was unlawful. JA 31-32 (Am. Complaint ¶¶ 111-115).

In 2011, PTOWM was replaced as the Pork Board's "brand identity" slogan with a new campaign: Pork: Be Inspired. JA 28-29 (Am. Complaint ¶¶ 99-101). Although there is a clause in the PTOWM purchase agreement that permits early termination with one-year written notice, that clause has not been exercised. JA 29 (Am. Complaint ¶ 102). The multi-million dollar annual payments for

12

PTOWM continue, despite the slogan's replacement. JA 29 (Am. Complaint ¶¶ 103-104).

The purchase price for PTOWM was premised on the avoidance of the cost of building a new brand. JA 29 (Am. Complaint ¶ 105). With the replacement of PTOWM, the Board now must commit—and, in fact, is committing—checkoff dollars to building Pork: Be Inspired as its "new brand identity." JA 28-30 (Am. Complaint ¶¶ 100, 105, 108). Count II of plaintiffs' amended complaint alleges that it was arbitrary and unlawful to approve checkoff expenditures for a replacement brand while simultaneously also approving checkoff expenditures *to avoid paying* for a replacement brand. JA 32-33 (Am. Complaint ¶¶ 116-122). Count III alleges that it was unlawful to approve the annual PTOWM payment—which had been justified only by its advertising value—after it has been removed from featured advertising campaigns. JA 33-34 (Am. Complaint ¶¶ 123-129).

### Procedural History

On September 24, 2012, Plaintiffs Dillenburg and Humane Society of the United States ("HSUS") filed this lawsuit in the U.S. District Court for the District of Columbia, seeking judicial review pursuant to

the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. On October 2, 2012, plaintiffs filed an amended complaint in which Iowa Citizens for Community Improvement ("Iowa CCI") joined as a plaintiff.

On January 11, 2013, defendant filed a motion to dismiss for lack of subject-matter jurisdiction pursuant to FRCP 12(b)(1). Plaintiffs filed an opposition to the motion on February 11, 2013, to which defendant filed a reply on February 26, 2013.

On May 31, 2013, a hearing was held in the district court. Following the hearing, the court ordered plaintiffs to submit a supplemental memorandum not to exceed five pages that addresses whether the individual (producer) plaintiff "has the injury in fact needed for constitutional standing purposes in response to the arguments set out in pages 12-13 of defendant's reply memorandum." Plaintiffs submitted the supplemental memorandum on June 10, 2013.

On September 25, 2013, the district court issued a judgment and decision granting defendant's motion to dismiss, finding that no plaintiff in the case had Article III standing. All plaintiffs filed timely notices of appeal.

## V. SUMMARY OF THE ARGUMENT

This case arrives at the court at the pleading threshold, where plaintiffs' burden is at the lowest level and requires a showing of only general factual allegations of injury resulting from the defendant's conduct. Plaintiffs easily meet this burden. As described above, the amended complaint contains detailed allegations of fact as to each element of Article III standing, which the district court was only able to dismiss by either failing to accept the allegations as true, or by reaching out and deciding ultimate issue of fact at the pleading stage. The court's decision to dispense with this action without liberally construing the allegations to embrace the specific facts the court found missing from the amended complaint's general allegations, further compounded the errors in the ruling. In short, despite the district court's thoughtful and considered discussion of the issues, the court's basis for dismissal simply cannot withstand appellate review.

Plaintiff Dillenburg is an assessment-paying pork producer who has a cognizable interest in a fully funded and lawfully operated pork checkoff program, as well as an interest ensuring that the funds aren't used to influence legislation or government policy that harms his

business interests. The entire pork checkoff assessment program is founded on the assurance that, in return for paying into the system, pork producers will benefit from checkoff expenditures that are lawful and reasonable, and that the program would not be used as a slush fund for political activity. Congress made this crystal clear by specifically prohibiting the use of checkoff funds to influence legislation.

Standing for Plaintiff Dillenburg *ends* the Article III inquiry, as standing for any one plaintiff is sufficient to establish the district court's jurisdiction. That doctrine notwithstanding, the organizational plaintiffs have also pled sufficient allegations to establish standing on behalf of both their members and themselves. As part of their mission activities, both organizational plaintiffs count among their membership assessment-paying pig producers who are both harmed by the diversion of funds for illegal or frivolous purposes – such as continuing to pay $3,000,000 a year for a featured advertising campaign that was terminated in 2011 – and by the political lobbying uses to which diverted funds are being put.

There are no further barriers to subject-matter jurisdiction presented by this matter. Plaintiffs timely invoked federal question

jurisdiction to review final agency action for which there is no other adequate remedy. Nothing further is required to pass beyond the litigation doorstep and proceed to the merits of this administrative review action. To the extent the factual doubts expressed by the district court as to plaintiffs standing allegations trouble either this Court or the defendants, the proper vehicle for resolving those issues is full briefing of the issues, based on the Administrative Record.

Plaintiffs bear the burden of *alleging* Article III standing at the pleading stage, which they have done. The burden of *proving* those allegations of fact is one that the plaintiffs fully embrace, and welcome the opportunity to do so – just not within the four corners of the amended complaint, as the district court seemed to feel was necessary. The judgment of the district court should be reversed.


## VI. ARGUMENT

### A. Standard of Review

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct are sufficient to establish standing and the court "presum[es] that general allegations embrace

17

those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In "reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). In reviewing a dismissal under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).

Federal question jurisdiction is established in the district court where, as here, plaintiffs' claims arise under the laws of the United States and are neither "immaterial and made solely for the purpose of obtaining jurisdiction" nor "wholly insubstantial and frivolous." *E.E.O.C. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 623 (D.C. Cir. 1997) (quoting from *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)).

Plaintiffs' amended complaint contains factually detailed allegations that, when liberally construed, easily satisfy the non-frivolous standard that defeats a jurisdictional challenge.

### B. The Amended Complaint Adequately Alleges Article III Standing

#### 1. Producer Dillenburg Has Pled Article III Standing.

To satisfy the injury in fact element of Article III standing, a plaintiff must have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Lujan*, 504 U.S. at 560. The court need only find one plaintiff who has standing for the case to survive an Article III challenge. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). Because defendant argued below that plaintiffs' presented nothing more than a "generalized grievance" and lacked any concrete and particularized interest in the allegedly unlawful conduct challenged in the amended complaint, it is necessary to first put that notion to rest, and then move on to plaintiffs' allegations on injury, and how that injury is caused by defendant's challenged conduct, and would be remedied by the requested relief.

a. Assessment-Paying Producers have Particularized and Concrete Interests in a Fully Funded and Lawfully Executed Checkoff.

Like other pork producers, federal statutes and regulations place Plaintiff Dillenburg in a special relationship to the pork checkoff fund. As a commercial pork producer he must contribute money to the pork checkoff, 7 U.S.C. § 4809(a)(1), he is eligible to become a board member of the Pork Board, 7 U.S.C. § 4808(a)(2)-(3), and he can vote to terminate the program if a referendum is called. 7 U.S.C. §§ 4811(b), 4812(b). In short, federal law imposes a special set of rights and obligations on Plaintiff Dillenburg, and federal law establishes some clear rules about how his checkoff program can and cannot use his and other contributing members' money.

Dillenburg and other producers are members of a small "class" and one whose interests Congress has clearly expressed an intent to protect and "in such cases, unless members of the protected class may have judicial review the statutory objectives might not be realized." *Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dept. of Agr.*, 573 F.3d 815, 823 (D.C. Cir. 2009) (*quoting Barlow v. Collins,* 397 U.S. 159, 167 (1970)). Thus Plaintiff Dillenburg possesses legally protected interests

in the procedures established pursuant to the Pork Act and Order, the rules promulgated by the latter of which frame the promotional program that producers voted to approve and fund. Where, as here, that producer-funded program is operated in violation of the laws governing its operation, producers suffer an injury in fact within the meaning of Article III, as discussed below.

At the outset, it is important to note that Plaintiffs *do not* challenge "lawful" checkoff activity with which they simply disagree. The conduct Plaintiffs challenge in this case is—and always has been—allegedly *unlawful* violations of the mandated standards and prohibitions to which checkoff expenditures must conform. Plaintiffs accept that within the lawful bounds of the Pork Act and Order, the Secretary may authorize the Board to engage in activities that plaintiffs might not like. Such discretionary choices, however, are not the subject of this lawsuit.[3]

---

[3] To illustrate by hypothetical example, if the Secretary authorized the Pork Board to pay $100,000 for a car with a market value of $5,000, producers could seek to enjoin such agency action as a violation of the legal requirement that checkoff expenditures must be reasonable. 7 C.F.R. § 1230.70 (Secretary can only approve expenses that he "finds are reasonable"). Among $5,000 cars, however, producers would have no

Defendant argued below that the producer plaintiffs lacked standing because their interest is purportedly only "in the lawful and prudent use of Pork Act assessments" and thus "are not particularized, but are instead shared by the public at large. For example, those interests are shared by citizens who enjoy bacon, ham, and other pork products." Def.'s Reply Brf., ECF 12, at p. 13. Notably, the district court did not adopt or rule on this argument that the producers who fund the checkoff have no more interest than consumers of their products. Such a rule would equate to the untenable argument that shareholders have no greater interest in a company's performance than the company's customers. Indeed, despite decades of litigation over federal commodity programs, plaintiffs are unaware of any federal court decision holding that producers compelled to pay into a federal checkoff program have no more interest in the lawful functioning of their checkoff programs than the average American consumer does.

---

right to enjoin the Secretary from authorizing the Pork Board to purchase a model they dislike. It is the former scenario that characterizes the allegations in this case, not the latter.

From top to bottom, producers play an active role in the pork checkoff legislative and regulatory scheme. Indeed, the Pork Order was initially promulgated only on a temporary basis with refundable assessments, its permanent continuance or termination dependent on the result of a mandatory referendum among assessment-paying producers. 7 U.S.C. § 4811. The program is exclusively funded by producers; the Act itself mandates that it shall be operated "at no cost to the Federal Government." 7 U.S.C. § 4801(b)(2). The Act prohibits the use of appropriations for checkoff operations and authorizes reimbursement of the Secretary's expenses from producer-paid assessments. 7 U.S.C. § 4819. The Pork Act even gives producers an ongoing termination option, mandating that the Secretary conduct a referendum on the request of 15% of producers. 7 U.S.C. §§ 4811(b), 4812(b).

The Pork Act and Order more than suffice to demonstrate the active role that producers play in their checkoff program, the accountability that Congress expects of the Pork Board and the Secretary, and the protected interests producers derive from the Pork Act and Order. After the Pork Order was published in 1986, producers

23

voted by referendum to approve it in May 1988. That vote, which made the self-imposed assessments mandatory and non-refundable, was made on the assurance that this government-supervised promotion program would spend producer funds in accordance with the rules and standards set forth in the legislation and the published order, which included the prohibitions against unreasonable expenditures or misuse of checkoff funds for policy-based messaging or activity.

The Congressional purpose of the Pork Act emphasizes the importance of the "establishment of an *orderly procedure*" for financing and carrying out the program's activities. 7 U.S.C. § 4801(b)(1)(emphasis added). These procedures—promulgated in the Pork Order—are among the core guarantees given to producers funding checkoff programs. The Pork Order mandates that the Secretary terminate any program that does not effectively contribute to the purposes of the Pork Act and the Pork Order (7 C.F.R. § 1230.60(b)); the Secretary must approve every expense by finding it to be "reasonable" (7 C.F.R. § 1230.70(a)); and checkoff assessments and proceeds from the investment of those assessments may be used only to fund plans and projects that comply with the Act, administrative expenses and a

reserve. (7 C.F.R. § 1230.73); and funds may not be used for lobbying (7 C.F.R. § 1230.74(a)).

Thus, despite the defendant's attempt to equate pork producers who are forced to pay into the checkoff by federal law with any citizen off the street with a bacon sandwich, the federal checkoff program places producers in a unique and discrete class, with both obligations to the program, and concrete and particularized legal interests in a fully funded and lawfully operated checkoff program that engages in legitimate generic promotions, as required by the Pork Act and Order.

### b. The Amended Complaint Alleges Injury in Fact to the Plaintiffs.

As discussed above, the amended complaint more than adequately alleges how the decisions at issue harm the plaintiffs, including by "diminish[ing] the resources available for promotions or other legitimate programs in support of the nation's pork industry for which expenditures under the Pork Act and Pork Order are mandated," and by "prevent[ing] these mandates from being fully implemented, thereby diminishing Mr. Dillenburg's return on his compelled checkoff investment." JA 11 (Am. Complaint ¶ 15). The amended complaint also

alleges that defendant's unlawful approvals of the contract and payments have resulted in $3,000,000 a year of federal checkoff funds being "distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his operations as an independent producer." JA 11 (Am. Complaint ¶ 16). The amended complaint makes similar allegations of injury as to the other plaintiffs. JA 10, 12 (Am. Complaint ¶¶ 14, 19-22).

The district court found both of these allegations of injury to be insufficient, but erred in both cases.

(1)    *The District Court Erred in Requiring the Amended Complaint Prove its Allegations of Harm from Diminished Checkoff Resources.*

As to Plaintiff Dillenburg's allegations of injury concerning defendant's diminution of the checkoff resource with unlawful and unreasonable expenditures, the court ignored pork producers' right to a fully funded checkoff that provides the maximum promotional power as intended by Congress. The unlawful removal of assets from the program funded by producers itself is an injury—it violates the "orderly procedure" the Act was intended to create and reduces the promotional

power of the program. *See* JA 31 (Am. Complaint ¶ 113, alleging defendant's approval of the transaction violated the Pork Act (7 U.S.C. §§ 4808-4809), the Pork Order (7 C.F.R. §§ 1230.58-70, 1230.73, 1230.88), and AMS Guidelines.)).

Instead of accepting the well-pled allegation that unlawfully spent checkoff funds diminish the resources available for legitimate promotion activities, the court focused its inquiry on whether producers could establish that unlawful expenditures would *actually* reduce their "return on investment" and whether the amended complaint proves that NPPC's *use* of the expenditures at issue was damaging to Dillenburg's business. This is asking far too much, especially at the pleading stage. *See Equal Rights Center v. Post Properties, Inc.*, 633 F.3d 1136, 1141 n. 3 (D.C. Cir. 2011)("the burden imposed on a plaintiff at the pleading stage is not onerous"); *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (general factual allegations are sufficient to satisfy standing at pleading stage).

The district court's analysis began, correctly, with the presumption that the "approvals of the purchase agreement and the subsequent payments were unlawful" (i.e., that the challenged

expenditures amounted to 1) unreasonable programmatic decisions, and 2) expenditures made for the unlawful purpose of influencing legislation). JA 51. But instead of liberally construing the amended complaint's allegations that the challenged payments are unreasonable from a promotional perspective, and that diverting promotional funds to fuel lobbying activities cause injury to the producers who fund the checkoff, the district court instead required plaintiffs to factually prove that producers as a whole would have seen a higher return on producer investments absent the challenged conduct in the amended complaint. *Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1254 (D.C. Cir. 2005) (explaining that at the pleading stage, the issue was not whether plaintiff had established proof of damages, but whether plaintiff sufficiently pled claims for them). Lacking such proof at the pleading stage, the court found the producer claim to be conjectural and insufficient for purposes of establishing injury in fact. JA 54.

To support its factual conclusion that Plaintiff Dillenburg was not actually harmed by the challenged conduct in the amended complaint, the district court cited to defendant's "return on investment" calculation

that projects the expected return for every dollar that producers "invested" in the checkoff. JA 54. The court concluded that, because the return on investment projections have been generally going up every year since 2005, Dillenburg's allegation that the challenged conduct reduces his return on investment in the checkoff was factually incorrect, and thus disregarded the allegation for purposes of establishing injury in fact. JA 54.

The district court's theory of injury would impose an inordinately high pleading burden on plaintiffs, and ignores the fact that the challenged agency conduct can cause economic harm to Dillenburg and other producers, even if the total rate of return has been climbing overall. Indeed, under the district court's theory, a regulated industry that wishes to establish standing to challenge an EPA regulation based on increased business overhead costs would be precluded from doing so in any segment of the industry where overhead costs were trending down *generally*.

This is equivalent to a stock portfolio manager arguing that she cannot be held liable for grossly mismanaging one security position because the client's overall portfolio has been increasing in value. That

has never been the law under Article III, in this Circuit or any other, and for good reason. It would severely preclude access to APA review for a huge number of regulated industries.

But even under the district court's heightened pleading threshold, the amended complaint is still adequate to plead an Article III injury. The court found no injury in fact based on its observation that no allegation was made that the unlawful expenditures "were ineffective at promoting pork and consequently reduced the return on his checkoff assessment." JA 54. But the amended complaint *does* make that allegation and provides extensive facts to support relevant inferences. Counts II and III of the amended complaint directly allege that the continued payments for PTOWM after it was "removed from advertising violates the restrictions of the Pork Act and Order … which require the termination of plans and projects that no longer contribute to effective promotion." JA 32-33 (Am. Complaint ¶ 119); *see also* 7 C.F.R. § 1230.60.

Indeed, it is a fundamental claim of plaintiffs' amended complaint that these funds were not used for promotion *at all*. The amended complaint alleges that the challenged funds were removed from lawful

promotional activity and spent for the purpose of funding NPPC's lobbying activity, which it is doing. See JA 31-34 (Am. Complaint ¶¶ 114, 121, 128). Inherent in this claim is the premise that funds spend on lobbying are less effective at promotion than funds spent on *actual* pork promotion. To the extent defendants may disagree with this fact, or indeed the court, that is not an issue to be resolved at the pleading stage. "[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *see also Louisiana Energy & Power Authority v. FERC,* 141 F.3d 364, 367–68 (D.C. Cir. 1998) (the question of whether a statute has been violated is one "that goes to the merits ... and not to constitutional standing"); *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987) (in a 12(b)(1) challenge, "the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant").

That producers may be injured by unlawful agency operation of mandatory agricultural commodity programs is hardly a novel concept

31

in this Circuit. Although there are differences, the pork checkoff program shares material similarities to other marketing programs that the Secretary implements under the Agricultural Marketing Agreement Act, 7 U.S.C. § 601, *et seq.*, making the established precedent in cases addressing those programs of particular value here. For example, the unlawful diversion of producer checkoff funds challenged here mirrors the type of interests at issue in *Stark v. Wickard*, 321 U.S. 288 (1944). *Stark* involved an allegation that the Secretary was unlawfully violating a milk marketing order in a way that reduced the funds that producers covered by the order would receive. In finding milk producers had standing, the Court very succinctly stated that "[i]t is because every dollar of deduction comes from the producer that he may challenge the use of the fund." *Id.* at 308. Further, because there was no administrative forum to hear the complaint in that case, judicial review was appropriate to ensure an aggrieved producer could seek appropriate relief.[4] *Id.* at 309-10.

---

[4] *Stark* also expressly rejected the government's argument that allowing judicial review would put "the agency at the mercy of objectors," noting that there were adequate judicial safeguards to prevent such a result

As in *Stark*, the pork checkoff is funded by pork producers, and contributing to the checkoff is mandatory. As in *Stark*, the producer Plaintiffs in this case have alleged an *unlawful* use of their checkoff funds, which has caused them injuries to their economic and other interests. As in *Stark*, there is no administrative option to seek appropriate relief. Thus, as in *Stark*, judicial review in the district court is the right forum—indeed the only forum—for aggrieved producer plaintiffs to seek review and remedy for the unlawful violations of their protected interests. *See also*, *Edaleen Dairy v. Johanns*, 467 F.3d 778, 782-3 (D.C. Cir. 2006); *Alto Dairy v. Veneman*, 336 F.3d 560, 568-9 (7th Cir. 2003).

In sum, the assessment-paying producers have particularized and concrete legal interests in a fully funded and lawfully operated Pork Act and Order. To be sure, the pork checkoff is indisputably a government machine, but producers are placed at the machine's power switch. Unless unlawful checkoff expenditures are determined to constitute injuries in fact, assessment-paying producers would be left only with

without precluding relief for otherwise justiciable claims. *Stark*, 321 U.S. at 310.

the power to start or stop the machine, but without the power to ensure the machine runs properly. Such a result cannot be reconciled with the core structure and fundamental purpose of the program.

> (2) *The District Court Erred In Finding Defendant's Transfer of Funds to A Lobbying Group Does Not Harm the Plaintiffs.*

The district court also erred in its dismissal of the amended complaint's allegations that defendant's unlawful approvals of the contract and payments have resulted in $3,000,000 a year of federal checkoff funds being "distributed to NPPC, a lobbying organization that pushes for policies that Mr. Dillenburg considers harmful to his interests." JA 11 (Am. Complaint ¶ 16).

The Pork Act is a generic promotion and research program, and using its funds for lobbying has always been unlawful. 7 U.S.C. § 4809. Senator Grassley emphasized the importance of this legal protection for producers during Congressional debate on the Pork Act: "[W]e should protect against making these producers *de facto* members of any association that they may not wish to be involved with." 131 Cong. Rec. S00000-04 (Nov. 20, 1985). *See also,* 7 U.S.C. § 7401(b) (Congressional

findings); 7 U.S.C. § 4801 (Congressional findings and declaration of purpose).

Plaintiff Dillenburg alleged that he is not a member of NPPC and he doesn't believe the policies that the group lobbies for are good for his business or the industry. JA 11 (Am. Complaint ¶ 16). The Pork Act, Order, and even the agency's checkoff oversight guidelines provide Mr. Dillenburg and other producers a legally protected assurance against becoming *de facto* supporters of policy organizations through their prohibitions against the use of funds to support such activities. 7 U.S.C. § 4809, 7 C.F.R. § 1230.74, and AMS Guidelines, Section VII. Plaintiff Dillenburg and other assessment-paying producers suffer injuries in fact sufficient for Article III standing the moment that the checkoff's generic promotional funds are unlawfully diverted from the program for improper lobbying purposes.

As the Northern District of California framed the issue in *Californians for Humane Farms v. Schafer*, Civ. No. 08-03843-MHP, 2008 WL 4449583, *9 n. 2 (N.D.Cal., Sept. 29, 2008):

> It is worth noting that misuse of Egg Board funds also implicates the interests of the producers who are required under federal law

to contribute check-off funds…A dollar spent on impermissible political advertisements in California is one less dollar that could be spent actually promoting "the incredible, edible egg" or pursing the Egg Board's legitimate programs in support of the nation's egg industry.

In addition to entirely discounting the diminishing effect of diverting checkoff funds on the producers paying into the fund, the district court also ignored the amended complaint's separate allegations of injury from Defendant's continued approval of annual $3,000,000 payments to NPPC *after* PTOWM was removed from all featured pork promotions in 2011.

As noted in the amended complaint, the decision to keep paying for an advertising campaign that is for all intents and purposes parked in the yard behind the Pork Board's office, "deprives producers of the use of checkoff funds for lawful promotions and effectively *gives* those funds to NPPC to use in programs intended to influence legislation and government policy." JA 34 (Am. Complaint ¶ 128). In short, since 2011, plaintiffs and other pork producers have been paying $3,000,000 per year in return for effectively nothing in return.

### c. The Amended Complaint Alleges Causation and Redressability because the Injuries Arise Directly from the Challenged Expenditures.

Because the injury in this case arises directly from the challenged expenditures, traceability poses no difficulty. And because enjoining the unlawful expenditures would eliminate the unlawful funding, redressability is easily satisfied, as well.

As discussed above, one of the reasons the district court believed that causation and redressability were lacking here was because some of the actions alleged to be harming plaintiffs are being carried out by NPPC (with federally granted money), and that this somehow washes clean any unlawful activity of the defendant or the Board that defendant controls.

The court reasoned that "[w]hat is unlawful under the statute here is the Pork Board's use of the checkoff funds for lobbying purposes," but since the actual on-the-ground lobbying is being carried out by an entity illegally funded by the Pork Board (rather than the Board itself), plaintiffs' have no standing to challenge the defendant's explicit approval of the Pork Board's decision. JA 61. ("Even if the Secretary's challenged approvals of the Pork Board's expenditures

37

enabled NPPC to receive the funds and use them in this manner, NPPC's lobbying is completely lawful." JA 61. )

This is a deeply troubling precedent, for reasons reaching far beyond this case. In essence, the district court concluded that if a federal agency is prohibited from using federal funds for a specific purpose, it can simply grant such funds to a private entity to use them contrary to statute, and parties aggrieved by that funding cannot obtain judicial review of the agency's decision because the *coup de grâce* of the harm to plaintiffs is delivered by a cooperating third party, and thus causation is lacking. Under this theory a whole mint of government money restricted by Congress for specific purposes can be laundered through private parties to end-run statutory limitations, and there will be nothing private entities aggrieved by such diversions can do about it under the judicial review provisions of the APA. If for no other reason, the district court's ruling should be vacated to remove this troubling precedent.

Equally erroneous was the district court's narrow focus on how NPPC may or may not use the funds and the threat to Dillenburg's business, even though the injury is complete as soon as NPPC receives

38

the funds approved by defendant empowering them to cause injury to Dillenburg and other producers. This is because the Pork Act and Order bans expending checkoff dollars in any manner for any lobbying purpose. 7 U.S.C. § 4809; 7 C.F.R. § 1230.74. The alleged unlawful act— which the court must presume true—is that the challenged expenditures are made *for the purpose* of funding NPPC's lobbying activities. JA 6, 31-34 (Am. Complaint ¶¶ 1, 111-129). The amended complaint details the history of the Board's intention and effort to secure a revenue mechanism for NPPC, which is suggested even more strongly now that the Board is still paying the full amount for PTOWM even after its replacement. JA 21-22, 28-31 Am. Complaint ¶¶ 60-65, 99-110). The amended complaint contains more than enough well-pled factual allegations that the challenged expenditures are being made for unlawful lobbying purposes.

The second prong of standing is "met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *ALDF v. Glickman*, 154 F.3d 426, 440

(D.C. Cir. 1998) (en banc).[5] Here, the millions in expenditures of federal checkoff funds for lobbying purposes would be illegal but for defendant's improper diversion of those funds to NPPC.

Nor is it of any moment that NPPC might continue to use some other funds to lobby against the plaintiffs, even if they are deprived of their current allowance of $3,000,000 per year from defendant. The Supreme Court has made clear that plaintiffs satisfy the redressability requirement when they show that a favorable decision will relieve some of their injuries, and "need not show [it] will relieve [] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Californians for Humane Farms* at *8 (enjoining the one-time transfer of $3 million in egg board checkoff funds, despite the fact that the receiving organization had already amassed over $2 million to support its efforts to oppose legislative reforms relating to animal welfare). Plaintiffs allege through facts and inference that the $60,000,000 dollar "purchase" of PTOWM is at its core a disguised

_____

[5] *See also Californians for Humane Farms* at *2 (noting that the egg commodity promotion board must receive prior approval from the Secretary of Agriculture for all expenditures, and thereafter ruling that the Secretary's approval of a transfer of the egg board's checkoff funds to an organization that could use the funds for lobbying purposes was unlawful under the APA).

mechanism to fund NPPC's legislative activities, a disguise that is significantly weaker after the Board replaced the slogan in 2011 but has opted to continue paying rather than electing to exercise an escape clause that would excuse the Board from having to pay the $30,000,000 remaining balance. JA 21-29, 31-34 (Am. Complaint ¶¶ 60-98, 103-104, 111-129).

Whether plaintiffs will ultimately prevail on their claims and what defenses the Secretary will raise to justify the annual payments are matters that go to the merits and will be resolved at a later stage of the case. Resolution of these merits-related issues are neither proper nor necessary at the pleading stage of the proceedings. *See Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (if jurisdictional facts "are inextricably intertwined with the merits of the case [the court] should usually defer its jurisdictional decision until the merits are heard").

Construed liberally and granting plaintiffs the benefit of all alleged facts and inferences derived therefrom, the detailed amended complaint is easily sufficient to establish Article III standing and subject-matter jurisdiction.

2. <u>The Amended Complaint Adequately Alleges Representational Standing.</u>

Because only one party with standing need be established to survive an Article III challenge, the issue of representational standing need not be addressed in depth. *See In re Naval Chaplaincy*, 697 F.3d at 1178. This is because both organizational plaintiffs plead representational standing on behalf of their producer members, based on the same injuries as Mr. Dillenburg, so the Court's decision on Plaintiff Dillenburg's standing effectively resolves the representational standing issue, as well. Should the Court reach the issue, both organizations adequately show Article III standing in their representational capacities.

An association has standing to sue on behalf of its members if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The requirement that the member interests an

organization seeks to protect through litigation be germane to the organization's purposes is "undemanding," and does not require that the goals of the lawsuit be "central" to the organization's purpose, or even "substantial[ly] overlap." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 56-58 (D.C. Cir. 1988). The "germaneness" prong "only" requires "mere pertinence between litigation subject and organizational purpose…" *Id.* at 58. In their amended complaint, both organizational plaintiffs adequately alleged standing to sue on behalf of their members. JA 10-12 (Am. Complaint ¶¶ 14, 20-21).

Plaintiff organizations alleged in the amended complaint that they have checkoff-paying pig farmers who are members because of their belief in the activities the organizations undertake in furtherance of responsible farming practices and against those that are harmful to animals, the environment, public health, and family farming. *Id.* Both organizations sufficiently asserted organizational interests that are germane to a lawsuit to enjoin unlawful checkoff expenditures for influencing legislation or government policies. *Id.* Both organizations fully engage in activities related to responsible farming practices in various areas that intersect with checkoff promotional activities. *Id.*

Animal care, environmental management, antibiotic use, the advantages of family farming over factory farming are among the issues of which both organizations and Pork Board actively engage and inform the public, as well as legislators and regulators. A lawsuit to enjoin unlawful activities that are detrimental to the organizations' work with farmers on various issues that overlap with checkoff activities well exceeds the undemanding threshold needed to establish germaneness.[6]

### 3. The Amended Complaint Adequately Alleges Organizational Standing.

The organizational plaintiffs alleged facts sufficient to satisfy Article III standing. Each plainly asserted in the amended complaint that they have had to devote resources to counter NPPC's unlawfully funded opposition activities. JA 9-10, 12 (Am. Complaint ¶ 11-12, 21). HSUS expressly alleges that since its "resources would otherwise be spent on advocacy, legislation, and education related to improving the

---

[6] The final prong of the representational standing analysis is uncomplicated in this case. The claims asserted and the relief requested do not require the direct participation of any member in order to prove the claims asserted or to fully obtain relief for all affected members. *See Hunt*, 432 U.S. at 344.

treatment of pigs and other animals, Defendant's unlawful conduct directly impedes Plaintiff's activities, and causes a significant drain on its resources and time." JA 9-10 (Am. Complaint ¶ 12). Further, "HSUS must expend *additional* resources to counter the improper actions of the Board and NPPC arising from the unlawful checkoff expenditures at issue." JA 10. (Am. Complaint ¶ 13) (emphasis added). Iowa CCI asserts that it "has devoted resources to counter NPPC's lobbying efforts on issues relating to factory farming and the environment and the defense of independent and family farmers." JA 12 (Am. Complaint ¶ 21).

For example, just months after securing the long-term revenue stream of checkoff dollars from the sale of PTOWM, NPPC at its 2007 annual meeting passed a resolution to "form a task force to develop [a] comprehensive strategy to address animal welfare issues such as state ballot initiatives driven by animal rights organizations and legislation supported by these groups for the purpose of mandating animal care practices." JA 8 (Am. Complaint ¶ 6). NPPC has used the challenged checkoff funds to actively oppose the legislative campaigns of the organizational plaintiffs, such as HSUS-backed federal legislation that would mandate cage space requirements for egg-laying hens. JA 9 (Am.

Complaint ¶ 11). Similarly, NPPC's checkoff-funded lobbying activities on behalf of large pork producers undermine Iowa CCI's lobbying efforts on behalf of independent and small family farmers. JA 12 (Am. Complaint ¶ 21).

The discrete, measurable harms alleged by the organizational Plaintiffs more than suffice to demonstrate cognizable injury in fact under *Havens Realty* and Circuit precedent applying that decision. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). In *Havens*, the plaintiff organization alleged that its organizational mission and activities had been "frustrated by defendants' [unlawful] practices" and that it had "to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory [ ] practices." *Havens*, 455 U.S. at 379. Finding this allegation sufficed for Article III standing, the Supreme Court held that "drain on an organization's resources ... constitutes far more than simply a setback to the organization's abstract social interests" and is therefore a "concrete and demonstrable injury to the organization's activities." *Id.*

Courts in this circuit have "applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Abigail*

*Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006). In *Abigail Alliance*, the Court of Appeals found organizational standing where the plaintiff had alleged that "[d]efendant's conduct has frustrated [plaintiff organization's] efforts to assist its members and the public ... and its other activities, including counseling, referral, advocacy, and educational services." *Id.* at 132-33 (citing *Havens Realty*, 455 U.S. at 378-79); *see also Humane Soc'y of the U.S. v. U.S. Postal Serv.*, 609 F.Supp.2d 85, 91 (D.C. Cir. 2009) (finding that HSUS had organizational standing to challenge an agency decision that facilitated animal fighting, because such activities created a need for the organization to spend its limited resources to address the problem, rather than expending such resources on the organization's other goals).

As the *Californians for Humane Farms* court observed, "[T]he availability of funds undeniably plays a role in the outcomes of elections" and the additional funds received from a checkoff program "would hardly be trivial" to the efforts of advocacy organizations attempting to pass legislation. 2008 WL 4449583, at *8, *11. Unlawfully fueling opposition efforts with millions of dollars in checkoff funds each

year poses a direct injury to the mission programs of the organizational plaintiffs, who then must divert resources that would otherwise further their missions to counter the unlawful inflow of checkoff-funded opposition attacks on plaintiffs' work.

The injuries of the organizational Plaintiffs are also fairly traceable to the defendant, and would be redressed by a favorable decision. The district court's finding to the contrary rests on an improper and unsupported *fact determination* that NPPC is an independent third-party whose decisions to use checkoff funds to lobby against plaintiffs' interests are independent of defendant's unlawful expenditures. JA 73. Plaintiffs assert by detailed fact and the inferences they support that NPPC is not an independent actor here, but that the Pork Board was looking for a mechanism to secure a revenue stream *for the purpose of funding* NPPC's lobbying operations. The PTOWM "purchase" agreement is exactly that mechanism, ensuring that NPPC's lobbying work is empowered with millions of checkoff dollars annually for two decades.

### C. Subject Matter Jurisdiction

The other subject matter jurisdiction issues that defendant raised below, which were not ruled upon, also pose no barrier to subject matter jurisdiction.

### 1. <u>Prudential Standing.</u>

Until recently, this Circuit treated prudential standing as a jurisdictional matter. *See, e.g., Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012). The Supreme Court effectively reversed that precedent by making clear that the prudential standing inquiry "does not implicate subject matter jurisdiction." *Lexmark International, Inc. v. Static Control Components, Inc.*, —— U.S. ——, 134 S.Ct. 1377, 1387 n. 4, (2014); *see also Mendoza v Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014); *Permapost Products, Inc. v. McHugh*, —— F.Supp.2d ——, 2014 WL 3056506, *7 (D.D.C. 2014). Because the zone of interests inquiry does not implicate a court's adjudicatory power to hear a case, it cannot play any role in the determination of the government's motion to dismiss in the instant case, which was a challenge exclusively directed

at the court's jurisdiction over the subject matter of the case under FRCP 12(b)(1).

2. <u>All expenditures were timely challenged.</u>

In the court below, Defendant challenged the timeliness of the lawsuit with respect to the defendant's approval of the 2006 expenditure.[7] The parties submitted conflicting documents relating to when defendant's approval was given. JA 38, 40. Plaintiffs contend that the effective date from which legal consequences flow was that of the execution of the purchase agreement on October 3, 2006. JA 28 (Am. Complaint ¶ 97). *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). If the district court had questions about that, however, plaintiffs requested the opportunity for jurisdictional discovery to resolve the conflicting dates in the documents. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, ECF 11, p. 28.

---

[7] Plaintiffs alleged that each annual approval and payment was a separate violation, so defendant's challenge relates only to the first of those payments. JA 31.

### 3. The APA is the Correct Vehicle for Review in the Instant Case.

The APA provides a waiver of sovereign immunity and a forum for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Absent APA review, plaintiffs have no other adequate remedy to enjoin unlawful agency actions in carrying out the "orderly procedure" established by the Pork Act and Order. The Pork Act provides only a limited form of administrative review for those producers requesting a "modification of" or an "exemption from" the Pork Order itself. 7 U.S.C. § 4814. Plaintiffs seek neither option here, leaving not just a lack of any adequate remedy, but a lack of any other remedies *at all*, thereby making APA review available. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986) (noting the strong presumption of reviewability of agency action).

### CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the District Court's order dismissing the plaintiff's amended complaint for lack of Article III standing be reversed. Plaintiffs further request that this Court enter an order that subject-matter jurisdiction is established.

Respectfully Submitted,

Filed:  January 16, 2014

/s/ Matthew E. Penzer
Matthew E. Penzer
Jonathan R. Lovvorn
2100 L. St., N.W.
Washington, DC 20037
(240) 271-6144
(202) 676-2357 Facsimile
Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 9915 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface of 14 point, Century, using Microsoft Word 2010.

/s/ Matthew E. Penzer
Matthew E. Penzer

# CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Matthew E. Penzer
Matthew E. Penzer

# Code of Federal Regulations

## Title 7 - Agriculture

Volume: 10
Date: 2014-01-01
Original Date: 2014-01-01
Title: Section 1230.74 - Prohibited use of distributed assessments.
Context: Title 7 - Agriculture. Subtitle B - Regulations of the Department of Agriculture (Continued). CHAPTER XI - AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; MISCELLANEOUS COMMODITIES), DEPARTMENT OF AGRICULTURE. PART 1230 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION. Subpart A - Pork Promotion, Research, and Consumer Information Order. - Expenses and Assessments.

**§ 1230.74        Prohibited use of distributed assessments.**

(a) No funds collected under this subpart shall in any manner be used for the purpose of influencing legislation as that term is defined in section 4911 (d) and (e)(2) of the Internal Revenue Code of 1954, or for the purpose of influencing governmental policy or action except in recommending to the Secretary amendments to this part.

(b) Organizations receiving distributions of assessments from the Board shall furnish the Board with annual financial statements audited by a certified public accountant of all funds distributed to such organizations pursuant to this subpart and any other reports as may be required by the Secretary or the Board in order to verify the use of such funds.

[51 FR 31903, Sept. 5, 1986, as amended at 53 FR 30245, Aug. 11, 1988; 60 FR 33683, June 29, 1995]

# ADDENDUM TABLE OF CONTENTS

1)      7 C.F.R. § 1230.74

2)      7 C.F.R. § 1230.70

3)      7 C.F.R. § 1230.60

4)      7 C.F.R § 1230.88

5)      7 C.F.R § 1230.58

6)      7 U.S.C. § 4908

7)      7 U.S.C. § 4809

# Code of Federal Regulations

## Title 7 - Agriculture

Volume: 10
Date: 2014-01-01
Original Date: 2014-01-01
Title: Section 1230.70 - Expenses.
Context: Title 7 - Agriculture. Subtitle B - Regulations of the Department of Agriculture (Continued). CHAPTER XI - AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; MISCELLANEOUS COMMODITIES), DEPARTMENT OF AGRICULTURE. PART 1230 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION. Subpart A - Pork Promotion, Research, and Consumer Information Order. - Expenses and Assessments.

**§ 1230.70        Expenses.**

(a) The Board is authorized to incur such expenses (including provision for a reasonable reserve that would permit an effective promotion, research, and consumer information program to continue in years when the amount of assessments may be reduced) as the Secretary finds are reasonable and likely to be incurred by the Board for its administration, maintenance, and functioning and to enable it to exercise its powers and perform its duties in accordance with the provisions of this subpart, including financing plans and projects. Such expenses shall be paid from assessments collected pursuant to § 1230.71 and other funds available to the Board, including donations.

(b) The Board shall reimburse the Secretary, from assessments collected pursuant to § 1230.71, for reasonable administrative expenses incurred by the Department with respect to this subpart after January 1, 1986, including any expenses reasonably incurred for the conduct of elections of nominees for appointment to the initial Delegate Body and for the conduct of referenda.

# Code of Federal Regulations

## Title 7 - Agriculture

Volume: 10
Date: 2014-01-01
Original Date: 2014-01-01
Title: Section 1230.60 - Promotion, research, and consumer information.
Context: Title 7 - Agriculture. Subtitle B - Regulations of the Department of Agriculture (Continued). CHAPTER XI - AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; MISCELLANEOUS COMMODITIES), DEPARTMENT OF AGRICULTURE. PART 1230 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION. Subpart A - Pork Promotion, Research, and Consumer Information Order. - Promotion, Research, and Consumer Information.

### § 1230.60 Promotion, research, and consumer information.

(a) The Board shall receive and evaluate, or, on its own initiative, develop, and submit to the Secretary for approval, any plans and projects. Such plans and projects shall provide for:

(1) The establishment, issuance, effectuation, and administration of appropriate plans and projects for promotion, research, and consumer information with respect to pork and pork products designed to strengthen the position of the pork industry in the marketplace and to maintain, develop, and expand domestic and foreign markets for pork and pork products;

(2) The establishment and conduct of research and studies with respect to the sale, distribution, marketing, and utilization of pork and pork products and the creation of new products thereof, to the end that marketing and utilization of pork and pork products may be encouraged, expanded, improved, or made more acceptable.

(b) Each plan and project shall be periodically reviewed or evaluated by the Board to ensure that the plan and project contributes to an effective and coordinated program of promotion, research, and consumer information. If it is found by the Board that any such plan and project does not further the purposes of the Act, the Board shall terminate such plan and project.

(c) No plan or project shall make a false or misleading claim on behalf of pork or a pork product or a false or misleading statement with respect to an attribute or use of a competing product.

(d) No plan or project shall undertake to advertise or promote pork or pork products by private brand or trade name unless such advertisement or promotion is specifically approved by the Board, with the concurrence of the Secretary.

**Expenses and Assessments**

# Code of Federal Regulations

## Title 7 - Agriculture

Volume: 10
Date: 2014-01-01
Original Date: 2014-01-01
Title: Section 1230.88 - Patents, copyrights, inventions, and publications.
Context: Title 7 - Agriculture. Subtitle B - Regulations of the Department of Agriculture (Continued). CHAPTER XI - AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; MISCELLANEOUS COMMODITIES), DEPARTMENT OF AGRICULTURE. PART 1230 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION. Subpart A - Pork Promotion, Research, and Consumer Information Order. - Miscellaneous.

### § 1230.88 Patents, copyrights, inventions, and publications.

Any patents, copyrights, trademarks, inventions, or publications developed through the use of funds collected under the provisions of this subpart shall be the property of the United States Government as represented by the Board, and shall, along with any rents, royalties, residual payments, or other income from the rental, sale, leasing, franchising, or other uses of such patents, copyrights, inventions, or publications inure to the benefit of the Board as income and be subject to the same fiscal, budget, and audit controls as other funds of the Board. Upon termination of this subpart, § 1230.85 shall apply to determine disposition of all such property.

# Code of Federal Regulations

## Title 7 - Agriculture

Volume: 10
Date: 2014-01-01
Original Date: 2014-01-01
Title: Section 1230.58 - Powers and duties of the Board.
Context: Title 7 - Agriculture. Subtitle B - Regulations of the Department of Agriculture (Continued). CHAPTER XI - AGRICULTURAL MARKETING SERVICE (MARKETING AGREEMENTS AND ORDERS; MISCELLANEOUS COMMODITIES), DEPARTMENT OF AGRICULTURE. PART 1230 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION. Subpart A - Pork Promotion, Research, and Consumer Information Order. - National Pork Board.

### § 1230.58    Powers and duties of the Board.

The Board shall have the following powers and duties:

(a) To meet not less than annually, and to organize and elect from among its members, by majority vote, a President and such other officers as may be necessary;

(b) To receive and evaluate, or, on its own initiative, develop, and budget for proposals for plans and projects and to submit such plans and projects to the Secretary for approval;

(c) To administer directly or through contract the provisions of this subpart in accordance with its terms and provisions;

(d) To develop and submit to the Secretary for the Secretary's approval, plans and projects conducted either by the Board or others;

(e) To prepare and submit to the Secretary for the Secretary's approval, which is required for the following to be implemented:

(1) Budgets on a fiscal period basis of its anticipated expenses and disbursements in the administration of this subpart, including the projected cost of plans and projects to be conducted by the Board directly or by way of contract or agreement; and

(2) The budget, plans, or projects for which State associations are to receive funds under § 1230.72, including a general description of the proposed plan and project contemplated therein;

(f) With the approval of the Secretary, to enter into contracts or agreements with any person for the development and conduct of activities authorized under this subpart and for the payment of the cost thereof with funds collected through assessments pursuant to § 1230.71. Any such contract or agreement shall provide that:

(1) The contracting party shall develop and submit to the Board a plan or project together with a budget or budgets which shall show the estimated cost to be incurred for such plan or project;

(2) Any such plan or project shall become effective upon approval of the Secretary; and

(3) The contracting party shall keep accurate records of all of its relevant transactions and make periodic reports to the Board of relevant activities conducted and an accounting for funds received and expended, and such other reports as the Secretary or the Board may require. The Secretary or employees of the Board may audit periodically the records of the contracting party;

(g) To appoint or employ staff persons as it may deem necessary, to define the duties and determine the compensation of each, to protect the handling of Board funds through fidelity bonds, and to conduct routine business.

(h) To disseminate information to or communicate with producers or State associations through programs or by direct contact utilizing the public postage system or other systems;

(i) To select committees and subcommittees of Board members and to adopt such rules and by laws for the conduct of its business as it may deem advisable;

(j) To utilize advisory committees of persons other than Board members to assist in the development of plans or projects and pay the reasonable expenses and fees of the members of such committees;

(k) To prescribe rules and regulations necessary to effectuate the terms and provisions of this subpart;

(l) To recommend to the Secretary amendments to this subpart;

(m) With the approval of the Secretary, to invest, pending disbursement pursuant to a plan or project, funds collected through assessments authorized under § 1230.71 in, and only in, an obligation of the United States, a general obligation of any State or any political subdivision thereof, an interest-bearing account or certificate of deposit of a bank that is a member of the Federal Reserve System, or an obligation fully guaranteed as to principal and interest by the United States.

(n) To maintain such books and records, which shall be available to the Secretary for inspection and audit, and prepare and submit such reports as the Secretary may prescribe from time to time, and to make appropriate accounting with respect to the receipt and disbursement of all funds entrusted to it;

(o) To prepare and make public and available to producers and importers at least annually, a report of its activities carried out and an accounting of funds received and expended;

(p) To have an audit of its financial statements conducted by a certified public accountant in accordance with generally accepted auditing standards at the end of each fiscal period and at such other times as the Secretary may request, and to submit a copy of each such audit report to the Secretary;

(q) To receive, investigate, and report to the Secretary complaints of violations of the provisions of this subpart;

(r) To submit to the Secretary such information pursuant to this subpart as the Secretary may request; and

(s) To carry out an effective and coordinated program of promotion, research, and consumer information designed to strengthen the position of the pork industry in the marketplace and maintain, develop, and expand markets for pork and pork products.

[51 FR 31903, Sept. 5, 1986, as amended at 53 FR 30245, Aug. 11, 1988]


**Promotion, Research, and Consumer Information**

**7 U.S.C.**
United States Code, 2012 Edition
Title 7 - AGRICULTURE
CHAPTER 79 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION
Sec. 4808 - National Pork Board
From the U.S. Government Printing Office, www.gpo.gov

## §4808. National Pork Board

(a)(1) The order shall provide for the establishment and appointment by the Secretary of a 15-member National Pork Board.

(2)[1] The Board shall consist of producers representing at least 12 States and importers appointed by the Secretary from nominations submitted under section 4806(g) of this title .

(2)[1] The Board shall consist of producers or importers appointed by the Secretary from nominations submitted under section 4806(g) of this title.

(3) A member of the Board shall serve for a 3-year term, with no such member serving more than two consecutive 3-year terms, except that initial appointments to the Board shall be staggered with an equal number of members appointed, to the maximum extent possible, to 1-year, 2-year, and 3-year terms, except that the term of a member of the Board shall continue until the successor of such member, if any, is appointed in accordance with paragraph (2).

(4) The Board shall select its President by a majority vote.

(5)(A) A majority of the members of the Board shall constitute a quorum at a meeting of the Board.

(B) A majority of votes cast at a meeting at which a quorum is present shall determine a motion or election.

(6) A member of the Board shall serve without compensation, but shall be reimbursed by the Board from assessments collected under section 4809 of this title for reasonable expenses incurred in performing duties as a member of the Board.

(b)(1) The Board shall—

   (A) develop, at the initiative of the Board or other person, proposals for promotion, research, and consumer information plans and projects;

   (B) submit such plans and projects to the Secretary for approval;

   (C) administer the order, in accordance with the order and this chapter;

   (D) prescribe such rules as are necessary to carry out such order;

   (E) receive, investigate, and report to the Secretary complaints of violations of such order;

   (F) make recommendations to the Secretary with respect to amendments to such order; and

   (G) employ a staff and conduct routine business.

(2) The Board shall prepare and submit to the Secretary, for the approval of the Secretary, a budget for each fiscal year of anticipated expenses and disbursements of the Board in the administration of the order, including the projected cost of—

   (A) any promotion, research or consumer information plan or project to be conducted by the Board directly or by way of contract or agreement; and

   (B) the budgets, plans, or projects for which State associations are to receive funds pursuant to section 4809(c)(1) of this title.

(3) No plan, project, or budget referred to in paragraph (1) or (2) may become effective unless approved by the Secretary.

(4)(A) The Board, with the approval of the Secretary, may enter into contracts or agreements with a person for—

   (i) the development and conduct of activities authorized under an order; and

   (ii) the payment of the cost thereof with funds collected through assessments under such order.

(B) Such contract or agreement shall require that—

   (i) the contracting party develop and submit to the Board a plan or project, together with a budget or budgets that include the estimated cost to be incurred under such plan or project;

   (ii) such plan or project become effective on the approval of the Secretary; and

   (iii) the contracting party—

     (I) keep accurate records of all relevant transactions of the party;

     (II) make periodic reports to the Board of—

(aa) relevant activities the party has conducted; and
(bb) an accounting for funds received and expended under such contract; and

(III) make such other reports as the Secretary or Board may require.

(Pub. L. 99–198, title XVI, §1619, Dec. 23, 1985, 99 Stat. 1612.)

[1] So in original. Two pars. (2) have been enacted.

**7 U.S.C.**
United States Code, 2012 Edition
Title 7 - AGRICULTURE
CHAPTER 79 - PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION
Sec. 4809 - Assessments
From the U.S. Government Printing Office, www.gpo.gov

## §4809. Assessments

### (a) Collection and remission to Board; persons required to pay

(1) The order shall provide that, not later than 30 days after the effective date of the order under section 4805(c) of this title an assessment shall be paid, in the manner prescribed in the order. Upon the appointment of the Board, the assessments held in escrow shall be distributed to the Board. Except as provided in paragraph (3), assessments shall be payable by—

(A) each producer for each porcine animal described in subparagraph (A) or (C) of section 4802(8) of this title produced in the United States that is sold or slaughtered for sale;

(B) each producer for each porcine animal described in subsection [1] 4802(8)(B) of this title that is sold; and

(C) each importer for each porcine animal, pork, or pork product that is imported into the United States.

(2) Such assessment shall be collected and remitted to the Board once it is appointed pursuant to section 4808 of this title, but, until that time, to the Secretary, who shall promptly proceed to distribute the funds received by him in accordance with the provisions of subsection (c) of this section, except that the Secretary shall retain the funds to be received by the Board until such time as the Board is appointed pursuant to section 4808 of this title, by—

(A) in the case of subparagraph (A) of paragraph (1), the purchaser of the porcine animal referred to in such subparagraph;

(B) in the case of subparagraph (B) of paragraph (1), the producer of the porcine animal referred to in such subparagraph; and

(C) in the case of subparagraph (C) of paragraph (1), the importer referred to in such subparagraph.

(3) A person is not required to pay an assessment for a porcine animal, pork, or pork product under paragraph (1) if such person proves to the Board that an assessment was paid previously under such paragraph by a person for such porcine animal (of the same category described in subparagraph (A), (B), or (C) of section 4802(8) of this title), pork, or pork product.

### (b) Rate of assessment; increase; waiver of collection of assessment

(1) Except as provided in paragraph (2), the rate of assessment prescribed by the initial order shall be the lesser of—

(A) 0.25 percent of the market value of the porcine animal, pork, or pork product sold or imported; or

(B) an amount established by the Secretary based on a recommendation of the Delegate Body.

(2) Except as provided in paragraph (3), the rate of assessment in the initial order may be increased by not more than 0.1 percent per year on recommendation of the Delegate Body.

(3) The rate of assessment may not exceed 0.50 percent of such market value unless—

(A) after the initial referendum required under section 4811(a) of this title, the Delegate Body recommends an increase in such rate above 0.50 percent; and

(B) such increase is approved in a referendum conducted under section 4811(b) of this title.

(4)(A) Pork or pork products imported into the United States shall be assessed based on the equivalent value of the live porcine animal from which such pork or pork products were produced, as determined by the Secretary.

(B) The Secretary may waive the collection of assessments on a type of such imported pork or pork products if the Secretary determines that such collection is not practicable.

### (c) Distribution and use

Funds collected by the Board from assessments collected under this section shall be distributed and used in the following manner:

(1)(A) Each State association, shall receive an amount of funds equal to the product obtained by multiplying—

(i) the aggregate amount of assessments attributable to porcine animals produced in such State by persons described in subsection (a)(1)(A) and (B) of this section minus that State's share of refunds determined pursuant to paragraph (4) by such persons pursuant to section 4813 of this title; and

(ii) a percentage applicable to such State association determined by the Delegate Body, but in no event less than sixteen and one-half percent, or

(B) in the case of a State association that was conducting a pork promotion program in the period from July 1, 1984, to June 30, 1985, if greater than (A) an amount of funds equal to the amount of funds that would have been collected in such State pursuant to the pork promotion program in existence in such State from July 1, 1984, to June 30, 1985, had the porcine animals, subject to assessment and to which no refund was received in such State in each year following December 23, 1985, been produced from July 1, 1984, to June 30, 1985, and been subject to the rates of assessments then in effect and the rate of return then in effect from each State to the Council described in paragraph (2)(A), and other national entities involved in pork promotion, research and consumer information.

(C) A State association shall use such funds and any proceeds from the investment of such funds for financing—

(i) promotion, research, and consumer information plans and projects, and

(ii) administrative expenses incurred in connection with such plans and projects.

(2)(A) The National Pork Producers Council, a nonprofit corporation of the type described in section 501(c)(3) of title 26 and incorporated in the State of Iowa, shall receive an amount of funds equal to—

(i) 37½ percent of the aggregate amount of assessments collected under this section throughout the United States from the date assessment commences pursuant to subsection (a)(1) of this section until the first day of the month following the month in which the Board is appointed pursuant to section 4808 of this title.[2]

(ii) 35 percent thereafter until the referendum is conducted pursuant to section 4811 of this title,

(iii) 25 percent until twelve months after the referendum is conducted, and

(iv) no funds thereafter except in so far as it obtains such funds from the Board pursuant to sections [3] 4808 or 4809 of this title, each of which amounts determined under (i), (ii), and (iii) shall be less the Council's share of refunds determined pursuant to paragraph (4).

(B) The Council shall use such funds and proceeds from the investment of such funds for financing—

(i) promotion, research, and consumer information plans and projects, and

(ii) administrative expenses of the Council.

(3)(A) The Board shall receive the amount of funds that remain after the distribution required under paragraphs (1) and (2).

(B) The Board shall use such funds and any proceeds from the investment of such funds pursuant to subsection (g) of this section for—

(i) financing promotion, research, and consumer information plans and projects in accordance with this chapter; [4]

(ii) such expenses for the administration, maintenance, and functioning of the Board as may be authorized by the Secretary;

(iii) accumulation of a reasonable reserve to permit an effective promotion, research, and consumer information program to continue in years when the amount of assessments may be reduced; and

(iv) administrative costs incurred by the Secretary to carry out this chapter,[4] including any expenses incurred for the conduct of a referendum under this chapter.[4]

(4)(A) Each State's share of refunds shall be determined by multiplying the aggregate amount of refunds received by producers in such State by the percentage applicable to such State pursuant to paragraph (1)(A)(ii).

(B) The National Pork Producers Council's share of refunds shall be determined by multiplying

its applicable percent of the aggregate amount of assessments by the product of—

    (i) subtracting from the aggregate amount of refunds received by all producers the aggregate amount of State share or refunds in every State determined pursuant to subparagraph (A), and

    (ii) adding to that sum the aggregate amount of refunds received by importers.

### (d) Prohibited promotions

No promotion funded with assessments collected under this chapter may make—

    (1) a false or misleading claim on behalf of pork or a pork product; or

    (2) a false or misleading statement with respect to an attribute or use of a competing product.

### (e) Influencing legislation prohibited

No funds collected through assessments authorized by this section may, in any manner, be used for the purpose of influencing legislation, as defined in section 4911(d) and (e)(2) of title 26.

### (f) Maintenance of books and records; audits

The Board shall—

    (1) maintain such books and records, and prepare and submit to the Secretary such reports from time to time, as may be required by the Secretary for appropriate accounting of the receipt and disbursement of funds entrusted to the Board or a State association, as the case may be; and

    (2) cause a complete audit report to be submitted to the Secretary at the end of each fiscal year.

### (g) Investment by Board of funds collected

The Board, with the approval of the Secretary, may invest funds collected through assessments authorized under this section, pending disbursement for a plan or project, only in—

    (1) an obligation of the United States, or of a State or political subdivision thereof;

    (2) an interest-bearing account or certificate of deposit of a bank that is a member of the Federal Reserve System; or

    (3) an obligation fully guaranteed as to principal and interest by the United States.

(Pub. L. 99–198, title XVI, §1620, Dec. 23, 1985, 99 Stat. 1614; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095.)

**REFERENCES IN TEXT**

This chapter, referred to in subsec. (c)(3)(B)(i), (iv), was in the original "this title" and was translated as reading "this subtitle", meaning subtitle B of title XVI of Pub. L. 99–198, which enacted this chapter, as the probable intent of Congress.

**AMENDMENTS**

**1986**—Subsecs. (c)(2)(A), (e). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

[1] *So in original. Probably should be "section".*

[2] *So in original. The period probably should be a comma.*

[3] *So in original. Probably should be "section".*

[4] *See References in Text note below.*