**[ORAL ARGUMENT SCHEDULED FOR MAY 7, 2015]**

CONSOLIDATED NOS. 13-5293, 13-5307

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE HUMANE SOCIETY OF THE UNITED STATES, *et al.*,

PLAINTIFFS-APPELLANTS,

V.

THOMAS VILSACK,

DEFENDANT-APPELLEE

# ON APPEAL FROM THE UNITED STATES DISTRICT
# COURT FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Matthew E. Penzer
Jonathan R. Lovvorn
2100 L. St., N.W.
Washington, DC 20037
(202) 955-3669
(202) 676-2357 Facsimile
mpenzer@humanesociety.org
Counsel for Plaintiffs-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... i

GLOSSARY ...................................................................................iv

I. INTRODUCTION AND SUMMARY ............................................1

II. ARGUMENT...........................................................................9

    A. Plaintiffs' Complaint Alleges Concrete Injuries, Traceable to Defendant's Conduct that are Redressable by the Relief Sought. ...................................................................................9

        1. Plaintiffs' Complaint Alleges An Article III Injury to the Producers from Unlawful Expenditures ......................10

        2. Defendant's Arguments that the Complaint Fails to Show Economic Harm to Producers are Flawed ................16

        3. The Producers' Injury from Unlawful Use of Checkoff Funds for Policy Purposes is Unique and Particularized to the Producers...................................20

        4. The Injuries Pled in the Complaint are Traceable to the Challenged Conduct and are Redressable by the Requested Relief......................................................23

    B. Producers are Entitled to APA Review Because the Pork Act Does Not Provide an Adequate Remedy.................................30

    C. Because their Producer Members Have Standing, the Organizational Plaintiffs Possess Article III Standing in their Representational Capacities...........................................35

    D. The Organizational Plaintiffs have Sufficiently Pled Organizational Standing ......................................................36

CONCLUSION ...............................................................................38

CERTIFICATE OF COMPLIANCE WITH FEDERAL
RULE OF APPELLATE PROCEDURE 32(A)(7)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ........................................ 30

*Abigail Alliance v. Eschenbach*, 469 F. 3d 129 (D.C. Cir 2006) ....... 35, 37

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004) .................................... 12

*Bowen v. Massachusetts* 487 U.S. 879 (1988) ........................................ 31

*\*Californians for Humane Farms v. Schafer*, Civ. No. 08-03843-

   MHP, 2008 WL 4449583 (N.D.Cal., Sept. 29, 2008) ..................... 26, 27

*City of Waukesha v. EPA,* 320 F.3d 228 (D.C. Cir. 2003) ...................... 25

*Garcia v. Vilsack*, 563 F.3d 519 (D.C.Cir.2009) ..................................... 31

*Haase v. Sessions*, 835 F.2d 902 (D.C. Cir. 1987) .................................. 20

*Havens Realty Corp v. Coleman*, 455 U.S. 363 (1982) ..................... 35, 37

*Herbert v. National Academy of Sciences,*

   974 F.2d 192 (D.C.Cir.1992) ............................................................. 26

*Hettinga v United States*, 560 F.3d 498 (D.C. Cir. 2009) ..................... 34

*Hotel and Rest. Employees Union, Loc. 25 v. Smith*, 846 F.2d 1499

   (D.C. Cir. 1988) ................................................................................. 20

*In re Naval Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012) ........................35

*Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d
   1249 (D.C. Cir. 2005) ......................................................15

*Larson v. Valente*, 456 U.S. 228 (1982) ..............................................8, 30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................19, 32

*Massachusetts v. EPA*, 549 U.S. 497 (2007)..............................................30

*Muir v. Navy Fed. Credit Union*, 529 F.3d 110 (D.C. Cir. 2008) ...........26

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ......................24

*United Transp. Union v. ICC*, 891 F.2d 908 (D.C. Cir. 1989) ................19

### Statutes

7 U.S.C. § 4805 ......................................................................................33

*7 U.S.C. § 4809(e) ..............................................................................7, 24

7 U.S.C. § 4814 ......................................................................................30

7 U.S.C. § 608c........................................................................................34

7 U.S.C. § 7401 ........................................................................................9

### Regulations

7 C.F.R. § 1230.60 ..............................................................................20, 24

7 C.F.R. § 1230.70 ..............................................................................20, 24

*7 C.F.R. § 1230.74 ................................................................ 20, 24, 26

7 C.F.R. § 1230.88 .......................................................................... 15

*7 C.F.R. Pt. 1230 ..................................................................... 10, 34

7 U.S.C. § 7401 .............................................................................. 21

Administrative Decisions

*In re McDowell, et al., 67 Agric. Dec. 1230 (U.S.D.A. 2008) .......... 31, 32

Congressional Record

131 Cong. Rec. S00000-04 (Nov. 20, 1985) ............................................ 21

131 Cong. Rec. S00000-31 (Nov. 21, 1985) ............................................ 10

# GLOSSARY

PTOWM        Pork: The Other White Meat

NPPC        National Pork Producers Council

APA        Administrative Procedure Act

# I. INTRODUCTION AND SUMMARY

The Complaint in this APA case was filed by a pork producer, and organizations representing pork producers, seeking judicial review of final agency actions approving the distribution of over $60,000,000 of pork producers' money in a manner alleged to be unlawful, arbitrary and capricious, and harmful to the plaintiffs' financial interests.

The Complaint addresses with particular detail defendant's arbitrary, capricious, and unlawful approval of the transfer of $60,000,000 from a producer-funded promotional program to a private lobbying group. The complaint alleges that the funds are being transferred at a rate of $3,000,000 annually for an unlawful purpose. The complaint details the mechanism for the transfer—an orchestrated trademark "purchase" agreement—and catalogs evidence showing why the astronomical payments cannot be justified as reasonable program expenditures. Yet the payments continue to be approved each year. The Complaint also specifically alleges that the final agency actions at issue "diminish[] the resources available for promotions or other legitimate programs" mandated by the Pork Act and Order and consequently

diminishing producer returns on their checkoff funds. JA 11 (Am. Complaint ¶ 15).

Defendant nevertheless maintains that the plaintiff pork producers' Complaint fails to adequately allege Article III standing because what the plaintiffs are *really* trying to do is "stop lobbying on the part of an independent non-profit, the National Pork Producers Council," and because the individual pork producer plaintiff "failed to allege concrete economic injuries." Def. Br. 2-3.[1]

As described in detail below, the injuries to producers from defendant's deprivation of the promotional value of millions of checkoff dollars every year is clearly pled in the Complaint. *See, for example,* JA 11, 33, 34 (Am. Complaint ¶¶ 15, 121, 128). Plaintiffs' claims are focused squarely on the actions of defendant – not some independent third party. The Complaint challenges final agency actions *by defendant*, which aggrieve plaintiffs in the manner described in the

---

[1] Defendant also maintains that judicial review is precluded because plaintiffs have a remedy under the Pork Act. But the limited review options under that law are inapplicable here and provide no basis for withholding judicial review of the final agency actions challenged in this case.

Complaint. While it is true the Complaint notes that the challenged actions of defendant unlawfully transferred over $60,000,000 to support NPPC's lobbying efforts, it is defendant's decision to authorize the transfers in violation of the Pork Act that is the primary injury to plaintiffs here, and not the subsequent decisions by NPPC about exactly how to lobby with funds that Congress has specifically commanded may not "in any manner, be used for the purpose of influencing legislation." 7 U.S.C. § 4809(e).

As described in the Complaint, the loss of these funds from legitimate checkoff activities reduces the return on investment for pork producers (as does any misappropriation of checkoff funds), just as surely as if defendant handed out the funds to Congressional candidates, or burned the producers' money in the agency's garbage incinerator.

Defendant cannot dismiss these injuries by claiming that the illegal diversion of millions of dollars doesn't harm the plaintiff investors because overall the fund at issue is "wildly successful." Def. Br. 13. Indeed, if the Pork Fund is "wildly successful" even with the misappropriation of $60,000,000, then presumably it would be

$60,000,000 *more successful* if plaintiffs were afforded the relief sought in this case – *i.e.,* the redirection of these millions to lawful purposes that benefit pork producers as contemplated by the Pork Act.

Nor is it any response to claim that NPPC or other private lobbying groups could still inflict *some* injuries on plaintiffs even if stripped of their $60,000,000 federal war-chest. Def. Br. 13. The fact that NPPC could still use other, lawful funds to harm plaintiffs' interests, does not in any way suggest that plaintiffs are not injured by the infusion of $60,000,000 of federal money into their campaigns. It has never been the case that a Plaintiff must demonstrate that *complete* relief will obtain from the desired judgment to satisfy Article III – only that "some relief" will be provided. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). The elimination of an unlawful $60,000,000 slush fund is not merely "some relief," it's a convoy of armored cars worth of relief.

In short, the Article III injuries pled in the Complaint stem from defendant's own actions in using what are supposed to be nonideological producer funds for an unlawful purpose. Checkoff funds cannot be used "*in any manner*" for the purpose of influencing legislation or

government policy. It is those unlawful expenditures that are alleged in the Complaint to be the traceable source of plaintiffs' injuries, which would be redressable if the expenditures were stopped. The allegations of the Complaint at this stage must be taken as true for a determination of standing. Therefore, and for the additional reasons below, the district court's order of dismissal should be reversed.

## II.   ARGUMENT

### A. Plaintiffs' Complaint Alleges Concrete Injuries, Traceable to Defendant's Conduct that are Redressable by the Relief Sought.

Commodity promotion programs are "self-help" programs for producers to fund "nonideological" promotion programs under the "supervision and oversight" of defendant. 7 U.S.C.A. § 7401. The programs can be of particular benefit to small producers because it pools funds to obtain greater promotional capability than they would be able to do individually. *Id.* Conversely, they can be of particular harm to small producers if defendant fails to safeguard the requirements and prohibitions of the programs because the pooled power of the funds could be used to influence policy and regulatory matters that they might object to and even consider harmful to their businesses. The

9

injuries to producers from the alleged violations in this case are concrete and particularized, arising from their economic interests in maximizing the program's returns and in assuring that their funds won't be used for the prohibited purpose of influencing lobbying activity that they oppose. JA 11, 33, 34 (Am. Complaint ¶¶ 15, 121, 128). The government conflates the nature of the two injuries (Def. Br. 14-15), but they are distinctly asserted in plaintiffs' complaint and each satisfies the threshold requirements of Article III standing.

1. Plaintiffs' Complaint Alleges An Article III Injury to the Producers from Unlawful Expenditures.

The unlawful removal of three million dollars from the pork checkoff program deprives producers of the promotional value and consequent investment returns on those funds. In voting to approve the regulations that govern the program, published as the Pork Order (7 C.F.R. Pt. 1230), producers accepted the burden of paying the full cost of the program, which is collected through mandated assessments. The pork checkoff, like all checkoffs, is designed to be a "self-help program for pork producers to be operated at no cost to the Nation's taxpayer." Senator Zorinsky (sponsor), 131 Cong. Rec. S00000-31 (Nov. 21, 1985).

Plaintiffs' economic interest in maximizing the promotional value of the program in order to maximize returns is directly alleged in the complaint, JA 11, 12, 33, 34 (Am. Complaint ¶¶ 15, 20, 121, 128) as is the injury to that interest from defendant's unlawful diminishment of program funds. *Id.*

Defendant's claim there is "no factual support" for the Complaint's allegations of economic harm caused by an unlawful diminishment of the program's promotional funds (Def. Br. 13), but defendant is wrong. Defendant overlooks the Complaint's extensive factual allegations detailing the efforts of the Pork Board—under defendant's supervision—to find a mechanism to secure a checkoff revenue stream for NPPC in an effort to fuel that organization's lobbying activity, rather than to utilize funds for lawful checkoff activities. JA 19-22 (Am. Complaint ¶¶ 55-65). The Complaint also states, unequivocally, that producers are being denied the promotional value of those funds. JA 11, 12, 33, 34 (Am. Complaint ¶¶ 15, 20, 121, 128). Additionally, Defendant's continued annual approvals could ultimately cost producers $40 million for trademark that has been replaced. JA 34 (Am. Complaint ¶ 125). The value of PTOWM was developed with 500 million

checkoff dollars, but producers are not receiving the credit to which they are entitled for that. JA 25 (Am. Complaint ¶¶ 79, 82).

At the pleading stage, the court construes a complaint "liberally," granting plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). The Complaint provides considerable detail concerning the Pork Board's purposeful efforts to find a way to get checkoff funds to support NPPC's activities JA 19-22 (Am. Complaint ¶¶ 55-65), the numerous and glaring red flags surrounding the "purchase" that should have prevented such a bad financial deal for producers JA 22-28 (Am. Complaint ¶¶ 66-98, and the continued annual multi-million dollar payments despite defendant's decision to effectively retire the slogan. JA 29-31 (Am. Complaint ¶¶ 101-110). The Complaint details how the ongoing payments—which defendant must evaluate each budget year for reasonableness and effectiveness—are still being approved, despite the fact that the checkoff program is getting nothing of real value in return and that defendant has the option of terminating the contract and canceling the remaining balance, which is more than 30 million checkoff dollars. JA 29 (Am. Complaint ¶¶ 102-104). Thus, the

Complaint makes clear that defendant is effectively "gifting" millions of checkoff dollars every year to a policy organization, thereby depriving producers the benefit of its use in accordance with the requirements and purpose of the program. See JA 33-34 (Am. Complaint ¶¶ 121, 128). Plaintiffs expressly allege that defendant's approval of the annual payments after PTOWM had been replaced "deprives producers of the use of checkoff funds for lawful promotions." *Id.*

These allegations speak to both merits issues and standing issues because they implicate not just the legal violations complained of, but also the injury to producers traceable to those violations because unlawful removal of the funds "diminishes the resources available for promotions or other legitimate programs in support" of the pork checkoff and, by preventing full implementation of the program's mandates, diminish producer returns on their assessments. JA 11, 12 (Am. Complaint ¶¶ 15, 20).

The Complaint also clearly alleges the overwhelming lack of benefits to producers from the challenged deal, which also supports the producer allegations of injury. These allegations include the agreement to quadruple the annual payments to NPPC despite the lack of any

competing buyers JA 21 (Am. Complaint ¶ 84), the exorbitant interest-inflated payout JA 18 (Am. Complaint ¶¶ 71-72), the "sealed" appraisal from the very executive who created the mark in the first place JA 27 (Am. Complaint ¶ 92), and the continued annual payments even after replacing PTOWM with an entirely new brand identity. JA 28-29 (Am. Complaint ¶¶ 99-104).

The Complaint also provides considerable factual support for why the challenged annual payments provide no benefit to the pork producer investors. At the time of the original deal in 2006, defendant purportedly authorized the purchase price of PTOWM to avoid having to pay for a replacement slogan to rebuild its brand; but in 2011, PTOWM was replaced anyway. JA 28-29 (Am. Complaint ¶¶ 99-104). Producers are suffering economic harm because defendant is approving payments for the Pork Board to "rebuild its brand and simultaneously spending checkoff funds *to avoid* rebuilding its brand." JA 29-30 (Am. Complaint ¶ 105). Factoring in the licensing deal that was in effect at the time defendant approved the astronomic purchase agreement, if the annual payments are not enjoined "the ultimate checkoff cost to producers for just two years of advertising PTOWM will be $59 million

dollars more than would have been expended under the licensing agreement through 2009." JA 31 (Am. Complaint ¶ 110).

And finally, the Complaint alleges that producers are entitled—but are being deprived of—the increased equitable value of PTOWM that developed as a result of the five hundred million checkoff dollars that funded the promotion and public awareness that made PTOWM so well known. *See* 7 C.F.R. § 1230.88; JA 25 (Am. Complaint ¶¶ 79-82). Instead of getting a credit, that checkoff-developed value is working "*to the detriment* of producers in the form of an increased purchase price." *Id.*

These allegations and others in the Complaint, as well as the reasonable inferences that may be drawn from them, more than suffice to demonstrate the economic injury to producers from the challenged expenditures. The fact that defendant disputes these allegations is not relevant to the standing analysis at this stage of the proceedings. *See Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1254 (D.C. Cir. 2005) (explaining that at the pleading stage, the issue was not whether plaintiff had established proof of damages, but whether plaintiff sufficiently pled claims for them).

2. Defendant's Arguments that the Complaint Fails to Show Economic Harm to Producers are Flawed.

Despite the voluminous allegations of harm in the Complaint, defendant offers a number of baseless attacks on the truth of the facts in the Complaint, none of which support early dismissal of this action. Defendant's primary attack is that the illegal diversion of millions of dollars alleged in the Complaint does not harm the producer plaintiff investors because overall the checkoff fund is "wildly successful." Def. Br. at 13.

In support of this argument, Defendant relies primarily on the pork checkoff's 2011 Return on Investment report, which assesses the overall rate of return of the program for the years 2006-2010. Def. Br. 13. Plaintiffs introduced the Return on Investment report in the court below to demonstrate the government's own estimation of the benefit or loss to producers from each checkoff dollar they contribute, depending on whether that dollar was lawfully spent in furtherance of the program or unlawfully removed. Plaintiffs' Supp. Memo., ECF 14, p. 2 (June 10, 2013). The report does not show whether individual expenditures increase or diminish the rate of return. That is a significant economic consequence to producers one way or the other. The report shows that

16

three million dollars a year added to the program's lawful promotional activities can be expected to yield a return many times over, and that three million dollars unlawfully removed from the program cannot yield a return at all.

Defendant's attempt to use the report to show that the illegal removal of tens of millions from the program doesn't harm producers misses the point of the report entirely, and does not even comport with basic principles of investment. If defendant is correct that the Pork Fund is "wildly successful" even with the misappropriation of $60,000,000, then presumably it would be $60,000,000 *more successful* if these millions were redirected to lawful purposes that benefit pork producers as contemplated by the Pork Act.

To illustrate the problem with defendant's position, suppose defendant authorized the use of checkoff funds to buy a Rolex watch for each member of Congress. According to the government, plaintiffs would "face a difficult task" in challenging these expenditures if the pork checkoff overall was producing a rate of return that was higher than in previous years. *See* Def. Br. 13. But the report doesn't assess whether the Rolex purchases actually contributed to or diminished the

17

checkoff's overall returns, nor how much money *should have been made* from expenditures. Indeed, under the government's theory of the case, if defendant threw three million checkoff dollars into a dumpster every year, the pork producer plaintiffs would be precluded from seeking judicial review of that conduct if the overall returns of the program generally were higher over previous years. Defendant cites no authority for this startling construction of the standing doctrine, which would excuse even the most egregious APA violations in favor of an overall programmatic assessment of an agency's success.

Even if defendant and the district court were correct about that, the report would still not justify the wholesale dismissal entered here, since the report only covers the fiscal years through 2010. This date is significant, as 2010 was the year the PTOWM marketing campaign was retired, even though producers continue to pay for it year after year. The report results do not even cover the time period and complaint allegations relating to two out of the three counts in this case. Thus, the report cannot be utilized, either correctly or incorrectly, to challenge any allegations made relating to the financial harm to the checkoff

program by continuing the multi-million dollar payments to NPPC *after* the slogan had been replaced in 2011.

Defendant also tries to factually attack Plaintiffs' allegation that funds spent on lobbying are less effective at promotion than funds actually spent on promotion. But it doesn't take an economist to work through such a straight-forward principle of financial logic. *See United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (court will credit applications of basic economic logic). The allegation that the unlawful use of funds for lobbying yield less returns for investors is neither fanciful or speculative, and at this early stage, general factual allegations of injury resulting from the defendant's conduct are sufficient to establish standing and the court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Defendant is free to disagree with plaintiffs' well-pled allegations of harm from the unlawful removal of three million promotional dollars a year, but such disagreement is a dispute for later proceedings, and has no place in a standing analysis on a motion to dismiss. At the pleading stage, "standing to pursue a claim rests on the theory of injury

presented in the complaint and the facts alleged in support of the claim." *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987); *see also Hotel and Rest. Employees Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1502 (D.C. Cir. 1988).

> 3. The Producers' Injury from Unlawful Use of Checkoff Funds for Policy Purposes is Unique and Particularized to the Producers.

The use of checkoff funds for the prohibited purpose of influencing legislation or government policy presents a unique and particularized threat to assessment-paying producers. Before a checkoff program can be permanently implemented, it must overcome an imposing design hurdle—how to get an industry-wide group of producers with diverse ideological and political backgrounds to come together to jointly vote to approve the program and accept the burden of collectively financing it.

The solution lies in the strict regulations contained in the Pork Order that the program's expenditures will be "reasonable," will be subject to the oversight and approval of defendant, and will not be used for the purpose of influencing policy issues. See 7 C.F.R. §§ 1230.60-70, 7 C.F.R. § 1230.74. The Pork Act and Order provide authority for

20

producers to call for a referendum to terminate the program by majority vote. Thus, it is no exaggeration to say that the pork checkoff depends for its life on the continued support and financial backing of producers. Unlawful operation of the program—whether through insupportable expenditures or by funding policy activity—erodes that support and threatens the viability of the checkoff altogether.

As part of the bargain struck with producers, Congress mandated that all checkoff laws strictly prohibit use of funds for ideological purposes. *See* 7 U.S.C. § 7401. These prohibitions are incorporated into the regulations that are published initially on a temporary basis until producer approval of the Order is given. Plaintiffs noted in their opening brief the importance of this legal protection that Congress intended for producers funding these programs. Senator Grassley emphasized that the Act should protect against making producers "de facto members of any association that they may not wish to be involved with." Pl. Br. 34. In fact, the association that Senator Grassley was referring to in his statement was none other than NPPC. 131 Cong. Rec. S00000-04 (Nov. 20, 1985). Also referring to NPPC, Senator Helms noted that it would be bad policy to "support such a group with pork

producer assessments." *Id.* Clearly, Congress was concerned from the outset about protecting producers from having their assessments diverted from generic promotion to fuel the policy activities of NPPC. As the Complaint makes clear, that's exactly what the Pork Board endeavored to do, and accomplished. *See, for example,* JA 21-22 (Am. Complaint ¶ 63)(after agreement to increase PTOWM annual license fee from $1.00 to $818,000, Pork Board CEO said it would "allow the NPPC to get the money they need for the next four years").

Defendant argues that pork producer Mr. Dillenburg's claims fail because he has not alleged direct economic harm to his business from NPPC's use of the misappropriated funds. But this analysis misunderstands the nature of the injury. Mr. Dillenburg, like all pork producers, is primarily injured by the unlawful elimination of $60,000,000 from the fund, which would otherwise be doing marketing work to improve his business. The Complaint also alleges that Mr. Dillenburg's opposition to NPPC's practices and his belief that they are detrimental to independent family farmers constitutes an additional harm from the unlawful expenditures. Mr. Dillenburg is not a member of NPPC and he objects to his assessment-funds being used for the

purpose of fueling the group's policy work. JA 11 (Am. Complaint ¶¶ 16-17). His injury is exactly the type that Senator Grassley and Helms sought to ensure that assessment-paying producers would be protected from, and precisely the type of injury that Congress was seeking to prevent with the enactment of the Pork Act.

    4.  The Injuries Pled in the Complaint are Traceable to the Challenged Conduct and are Redressable by the Requested Relief.

In order to get around the Complaint's extensive allegations of injury, causation, and redressability—as well as the fact that the injuries at issue are precisely the injuries Congress was trying to prevent with the Pork Act—defendant leans heavily on the claim that the injuries at hand stem from the activities of NPPC, rather than defendant. Def. Br. 16. But Plaintiffs' claims are focused squarely on the actions of defendant—not some independent third party. The Complaint challenges final agency actions *by defendant*, which aggrieve plaintiffs in the manner described in the Complaint. While it is true the Complaint notes that the challenged actions unlawfully transferred over $60,000,000 to support NPPC's lobbying efforts, it is defendant's

decision to authorize the transfers in violation of the Pork Act that is the primary injury to plaintiffs here, and not the subsequent decisions by NPPC of exactly how to lobby with funds that Congress has specifically commanded may not, "in any manner, be used for the purpose of influencing legislation." 7 U.S.C. § 4809(e).

As discussed above, the producers' injuries are based on their interests in a fully funded checkoff that maximizes their economic returns and prohibits arbitrary, unreasonable, and unlawful expenditures, including the use of funds for policy activities. *See* 7 C.F.R. §§ 1230.60-70, 7 C.F.R. § 1230.74. These injuries are directly traceable to the challenged expenditures and would be redressed by the injunctive relief sought from this Court.[2]

In support of defendant's claim that the injuries complained of are the result of the independent action of NPPC, defendant relies on *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976). Def. Br. 22-23. But

---

[2] Defendant implies some negative inference to be drawn from the omission of redressability from plaintiffs' supplemental memo to the district court. Def. Br. 16. But the order issued by the district court authorized only briefing on the issue of "injury-in-fact" and had separately indicated that nothing else should be included in the memo. *See* Minute Order (May 31, 2013) and Tr. 59-60 (ECF 21).

*Simon* is readily distinguishable from the instant case. On its face, the conduct complained of in *Simon* was alleged merely to have "encouraged" the injurious conduct of third parties, with the court's remedial options limited only to the removal of that encouragement. *Simon*, 426 U.S. at 41-43 (no standing to challenge grant of favorable tax treatment to hospital that did not serve indigents, because even if tax status were changed, it was speculative that hospital would serve indigents). In this case, plaintiffs allege not that defendant "encouraged" the injurious lobbying activity, but that defendant specifically intended to fund it, and succeeded in doing so.

There is a material difference between a federal agency "encouraging" injurious activity and "funding" injurious activity. This is a case where the challenged conduct is a but-for cause of the injury; the injunctive relief sought would therefore stop it. In any event, at this pleading stage, the court must accept the well-pled allegations, construed liberally, and "must be careful not to decide the questions on the merits for or against the plaintiff." *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003); *see also, Muir v. Navy Fed. Credit*

*Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008); *Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Defendant's redressability arguments – and indeed all of its Article III claims – are also impossible to reconcile with the only other federal case involving a challenge to the use of checkoff funds to influence legislation – *Californians for Humane Farms v. Schafer*, Civ. No. 08-03843-MHP, 2008 WL 4449583 (N.D. Cal., Sept. 29, 2008). Defendant takes the position that *Californians for Humane Farms* is distinguishable because it involved lobbying conducted by the Egg Board itself, rather than by diverting the funds through a third party. Def. Brf at 35. This argument misses the point. *Californians for Humane Farms* did not turn on the *mechanism* used to achieve the prohibited lobbying, but only on whether the expenditures were improperly made *for that purpose. Californians for Humane Farms*, 2008 WL 4449583 at *5.

The language of the prohibitions against use of checkoff funds for lobbying is written in sweepingly broad terms. The Pork Order prohibits the use of funds "in any manner" for the purpose of influencing legislation or government policy. 7 C.F.R. § 1230.74. The

inquiry must focus on the purpose of the expenditure, not on the manner of execution. This is certainly reinforced by the court's preliminary injunction, which enjoined the prohibited expenditure of checkoff funds "in any manner whatsoever, whether undertaken by the American Egg Board *or any other person or entity.*"[3] *Californians for Humane Farms*, 2008 WL 4449583 at *10 (emphasis added).

As in the instant case, the Secretary in *Californians for Humane Farms* denied that the challenged funds were being spent for a prohibited purpose. Tr. 46-47 (ECF 21). Instead, the Secretary claimed the expenditures were for a lawful, "educational" use. The court rejected that defense and found that the money was really being spent to influence the Prop 2 vote. As in that case, plaintiffs here maintain that the ongoing payments for a retired "asset" are being labeled one thing

---

[3] To clarify a point from plaintiff's opening brief relating to whether the Egg Board was directly engaging in lobbying or diverting funds through a third party, it is important to note that the case was brought and the injunction issued before any funds were actually spent. The funds were intended to "supplement" the efforts of the opponents of a bill and the court's consideration of the injury included the effect of that supplement on top of the ongoing efforts by other groups. How the funds would actually be spent, whether directly or indirectly, was not fully addressed. In all events, though, the key factor in the case was the improper *purpose* of the funds.

(i.e., trademark purchase), but are really being made for an unstated and prohibited purpose (i.e., lobbying activities). *Id.* Plaintiffs are prepared to prove their allegations at the appropriate stage of litigation; at the pleading stage, Plaintiffs need only sufficiently allege them, as they have done.

Defendant also argues that redressability presents an obstacle to standing for the organizations because NPPC could still engage in lobbying activity with the remainder of its funding even if the three million checkoff dollars it receives each year were enjoined. Def. Br. 24. But the fact that NPPC could still use other, lawful funds to harm plaintiffs' interest, does not in any way suggest that plaintiffs are not injured by the infusion of $60,000,000 of federal money into their campaigns.

Redressability requires no such all-or-nothing approach. For good or ill, three million dollars a year can fuel a substantial amount of lobbying activity. What NPPC does with its remaining funds is of no relevance to this lawsuit. The relevant focus for the case is the unlawful removal of checkoff money that would otherwise be used to the benefit of the producer investors. Even with regard to the secondary injuries

caused by the ultimate use of those misdirected funds, the Complaint alleges that the annual payments to NPPC constitute approximately one-third of that organization's entire budget. Thus, defendants are correct in their grossly misleading assertion that that the funding illegally provided by USDA "is a fraction" of NPPC's total lobbying budget. Def. Br. 16. It just happens to be a huge fraction of their budget.

Thus, this is not a case where the challenged illegal funding is some small portion of a much larger operation, the removal of which will have no significant impact one way or the other on the parties. Even in Washington D.C., $60,000,000 is a lot of lobbying money, and it's hard to imagine anyone claiming USDA's illegal disbursement of three million dollars a year to the Democratic Party would not cause an Article III injury to the Republican Party because it would only constitute "a fraction" of the DNC's annual political spending.

In short, whatever policy activities that three million dollars improperly generates will be redressed by enjoining its use for the purpose of influencing legislation or government policy. A plaintiff satisfies the redressability requirement when it shows that a favorable decision will relieve some of its injuries, and "need not show [it] will

29

relieve [] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (rejecting the defendant's "erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum").

### B. Producers are Entitled to APA Review because the Pork Act Does Not Provide an Adequate Remedy.

Defendant argues that the Pork Act's review provision provides an adequate remedy that operates as a bar to APA review.[4] Def. Br. 17. But the scope of that provision is limited only to producers seeking a "modification of" or an "exemption from" the Pork Order itself. 7 U.S.C. § 4814. Plaintiff seeks *neither* remedy here, leaving not just a lack of any adequate remedy, but a lack of *any administrative options at all*.

The APA "embodies the basic presumption of judicial review" of agency action. *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). In

[4] At the hearing before the district court, defendant took the contrary position that the Pork Act's review provision *would not* apply if he was looking to stop the challenged expenditures). Tr, p. 13 (ECF 21). Defendant offers no explanation for this change in position.

determining whether an alternative remedy is adequate, courts must give the APA's "generous review provisions" a "hospitable interpretation," such that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." *Id.* at 141 (internal quotation marks omitted); *see Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C.Cir.2009).

Under this standard, "[a]n alternative remedy will not be adequate ... if the remedy offers only 'doubtful and limited relief'" *Garcia*, 563 F.3d at 522 (quoting *Bowen v. Massachusetts* 487 U.S. 879, 901 (1988)). "The exception ... should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903.

There appears to be just one administrative decision construing the scope of the Pork Act's review provision—and the construction it advances conflicts with defendant's argument here. *See In re McDowell, et al.*, 67 Agric. Dec. 1230 (U.S.D.A. 2008). In *McDowell*, producers and organizations acting on behalf of their producer-members administratively challenged the lawfulness of pork checkoff expenditures for a certain program to study air emissions at hog feeding

operations. Petitioners sought, among other remedies, to stop the allegedly unlawful payments and to return the funds already spent to the checkoff fund. The Judicial Officer dismissed the petition on several grounds, one of which was that the claims were not an effort to "seek modification of or exemption from the Pork Order" and thus was not actionable under the Pork Act's review provision. *In re McDowell* at 1238.[5] The outcome in *McDowell* – penned by defendant's own administrative law judge – strongly suggest that USDA's administrative process would result in the denial of the very administrative remedy defendant argues is available in this case.

Defendant also suggests that producers who object to defendant's unlawful operation of the program can simply petition for an exemption from the Order. Defendant cites no legal basis on which the exemption could be granted, but even if it could, it absolutely would not be an

---

[5] Also, among the grounds for dismissal is a one-paragraph determination denying standing (apparently under Article III) based on the "nature of the claims." *Id.* Since the basis of administrative jurisdiction for the proceeding was the Pork Act's review provision and not Article III, the "injury in fact" comment is puzzling. *Id.* Undersigned counsel has found no other USDA decision that references "injury in fact" or the *Lujan* standing requirements expressly relied upon in *McDowell.*

adequate remedy here. The plaintiffs are not seeking to get out of the program, or to avoid paying their mandated assessments. Rather, the remedy they seek is to stop the misdirection of investment funds, and the deployment of those funds for prohibited lobbying purposes that hurt small farmers. An order by USDA relieving them of their obligation to pay the assessment is hardly an adequate substitute.

Defendant's argument for exemption is not just inadequate, it would actually pose and even greater injury to producers. This is so because the checkoff programs involve just a single order that applies to all producers equally. 7 U.S.C. § 4805(b). If any one producer could obtain an exemption for the defendant's unlawful operation of the program, so too could each of the other 69,000 producers paying the checkoff.

Defendant's argument that the expenditures at issue are actually part of the Pork Order or somehow "impose an obligation in connection with an order" fares no better than his exemption argument. See, for example, 7 U.S.C.A. § 4805(d)(stating the terms and conditions that shall be included in orders and *prohibiting any others*). Plaintiffs are aware of no authority supporting this position or any agency case in

which such a modification was granted. The only case plaintiffs are aware of relating to that phrase involved the similarly worded review provision of the Agricultural Marketing Agreement Act of 1937. 7 U.S.C. § 608c. Although the claims in that case were distinctly different than the instant case, the court's comment on the relevant language of the review provision "indicates Congress was referring to obligations imposed by the Secretary *in the marketing orders*, not a more general statutory obligation to be subject to such administrative orders." *Hettinga v United States*, 560 F.3d 498, 505 (D.C. Cir. 2009)(emphasis added)*.*

As defendant acknowledges in his brief, the Pork Order consists of the promulgated rules contained in Title 7, Part 1230, of the Federal Code of Regulations. Def. Br. 4. Plaintiffs do not need the rules modified. Plaintiffs do not need to be exempted from the rules. What plaintiffs need is to stop defendant from *breaking* the rules. Only the APA affords that remedy to their injuries.

C. Because their Producer Members Have Standing, the Organizational Plaintiffs Possess Article III Standing in their Representational Capacities.

As plaintiffs noted in their opening brief, because only one party with standing need be established to survive an Article III challenge, the issue of representational standing need not be addressed in depth. *See In re Naval Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). This is because both organizations claim representational standing on behalf of their producer members. JA 10-12 (Am. Complaint ¶¶ 14, 20-21).

Plaintiffs and Defendant both appear to agree that representational standing in this case turns on the issue of whether the producer members of the organizations can establish standing in their own rights. Defendant makes no challenge to any other factor of representational standing. Should the Court reach the issue, both organizations adequately show Article III standing in their representational capacities, and there is no need to explore other injuries.

D. The Organizational Plaintiffs have Sufficiently Pled Organizational Standing

Defendant claims the organizational plaintiffs have not met the standards of *Havens Realty Corp v. Coleman*, 455 U.S. 363 (1982) and *Abigail Alliance v. Eschenbach*, 469 F. 3d 129 (D.C. Cir 2006) because the Complaint does not allege "harm to any discrete activities" or that plaintiffs have had to "devote significant additional resources" because of the challenged actions. Def. Br. 21-25.

Here again, defendants have simply ignored the allegations in the Complaint. Paragraph 12 specifically says that "HSUS has had to divert and devote resources to counter NPPC's activities to obstruct its work" that "HSUS resources would otherwise be spent on advocacy, legislation, and education related to the treatment of pigs and other animals," and that "Defendant's unlawful conduct directly impedes Plaintiffs' activities, and causes a significant drain on its resources and activities." Paragraphs 5-9 provide the factual specifics of how these injuries have come about, while paragraph 13 explains how defendant's authorization the misuse of three million dollars a year to fund these harmful activities constitutes "a major source of NPPC's revenue" to

inflict these injuries, and constitutes as much as 32% of NPPC's entire budget. JA 10 (Am. Complaint ¶ 13).

Thus, while defendant may disagree with these well-pled facts, the Complaint clearly alleges that the challenged agency actions at issue "obstruct HSUS's core mission to promote humane care, oppose intensive confinement, and advance the legal protections that promote the well-being of animals," JA 10 (Am. Complaint ¶ 13), and these allegations fit squarely within *Havens* and *Abigail Alliance*.

## CONCLUSION

Construing the Complaint liberally and granting plaintiffs all inferences that can be derived from the allegations, plaintiffs readily meet the threshold pleading requirements to demonstrate standing. Also, because plaintiffs do not seek an exemption from or modification of the Pork Order, as codified in the Code of Federal Regulations, the Pork Act provides no adequate forum to enjoin defendant's unlawful violations of the Act and Order. Thus there is no bar to the generous scope of administrative review afforded under the APA.

Plaintiffs have demonstrated all that is required to cross the pleading-stage threshold and proceed to the merits stage. Plaintiffs ask this Court to reverse the decision of the district court.

Respectfully Submitted,

Filed:  March 13, 2015

/s/ Matthew E. Penzer
Matthew E. Penzer
Jonathan R. Lovvorn
2100 L. St., N.W.
Washington, DC 20037
(240) 271-6144
(202) 676-2357 Facsimile
Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A)(7)

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 6804 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface of 14 point, Century, using Microsoft Word 2010.

/s/ Matthew E. Penzer
Matthew E. Penzer

# CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2015, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Matthew E. Penzer
Matthew E. Penzer

# ADDENDUM

# TABLE OF CONTENTS

7 C.F.R. § 1230.60 .......................................................................... A-1

7 C.F.R. § 1230.70 .......................................................................... A-3

7 C.F.R. § 1230.74 .......................................................................... A-4

7 C.F.R. § 1230.88 .......................................................................... A-5

7 U.S.C. § 4814 .............................................................................. A-6

7 C.F.R. § 1230.60

§ 1230.60 Promotion, research, and consumer information.

(a) The Board shall receive and evaluate, or, on its own initiative, develop, and submit to the Secretary for approval, any plans and projects. Such plans and projects shall provide for:

(1) The establishment, issuance, effectuation, and administration of appropriate plans and projects for promotion, research, and consumer information with respect to pork and pork products designed to strengthen the position of the pork industry in the marketplace and to maintain, develop, and expand domestic and foreign markets for pork and pork products;

(2) The establishment and conduct of research and studies with respect to the sale, distribution, marketing, and utilization of pork and pork products and the creation of new products thereof, to the end that marketing and utilization of pork and pork products may be encouraged, expanded, improved, or made more acceptable.

A-1

(b) Each plan and project shall be periodically reviewed or evaluated by the Board to ensure that the plan and project contributes to an effective and coordinated program of promotion, research, and consumer information. If it is found by the Board that any such plan and project does not further the purposes of the Act, the Board shall terminate such plan and project.

(c) No plan or project shall make a false or misleading claim on behalf of pork or a pork product or a false or misleading statement with respect to an attribute or use of a competing product.

(d) No plan or project shall undertake to advertise or promote pork or pork products by private brand or trade name unless such advertisement or promotion is specifically approved by the Board, with the concurrence of the Secretary.

7 C.F.R. § 1230.70

§ 1230.70 Expenses.

(a) The Board is authorized to incur such expenses (including provision for a reasonable reserve that would permit an effective promotion, research, and consumer information program to continue in years when the amount of assessments may be reduced) as the Secretary finds are reasonable and likely to be incurred by the Board for its administration, maintenance, and functioning and to enable it to exercise its powers and perform its duties in accordance with the provisions of this subpart, including financing plans and projects. Such expenses shall be paid from assessments collected pursuant to § 1230.71 and other funds available to the Board, including donations.

(b) The Board shall reimburse the Secretary, from assessments collected pursuant to § 1230.71, for reasonable administrative expenses incurred by the Department with respect to this subpart after January 1, 1986, including any expenses reasonably incurred for the conduct of elections of nominees for appointment to the initial Delegate Body and for the conduct of referenda.

7 C.F.R. § 1230.74

§ 1230.74 Prohibited use of distributed assessments.

(a) No funds collected under this subpart shall in any manner be used for the purpose of influencing legislation as that term is defined in <u>section 4911 (d)</u> and <u>(e)(2) of the Internal Revenue Code</u> of 1954, or for the purpose of influencing governmental policy or action except in recommending to the Secretary amendments to this part.

(b) Organizations receiving distributions of assessments from the Board shall furnish the Board with annual financial statements audited by a certified public accountant of all funds distributed to such organizations pursuant to this subpart and any other reports as may be required by the Secretary or the Board in order to verify the use of such funds.

# 7 C.F.R. § 1230.88

## § 1230.88 Patents, copyrights, inventions, and publications.

Any patents, copyrights, trademarks, inventions, or publications developed through the use of funds collected under the provisions of this subpart shall be the property of the United States Government as represented by the Board, and shall, along with any rents, royalties, residual payments, or other income from the rental, sale, leasing, franchising, or other uses of such patents, copyrights, inventions, or publications inure to the benefit of the Board as income and be subject to the same fiscal, budget, and audit controls as other funds of the Board. Upon termination of this subpart, § 1230.85 shall apply to determine disposition of all such property.

## 7 U.S.C. § 4814

### § 4814. Petition and review

**(a)(1)** A person subject to an order may file with the Secretary a petition--

**(A)** stating that such order, a provision of such order, or an obligation imposed in connection with such order is not in accordance with law; and

**(B)** requesting a modification of such order or an exemption from such order.

**(2)** Such person shall be given an opportunity for a hearing on the petition, in accordance with regulations issued by the Secretary.

**(3)** After such hearing, the Secretary shall make a determination granting or denying such petition.

**(b)(1)** A district court of the United States in the district in which such person resides or does business shall have jurisdiction to review such determination if a complaint for such purpose is filed not later than 20 days after the date such person receives notice of such determination.

**(2)** Service of process in such proceeding may be made on the Secretary by

delivering a copy of the complaint to the Secretary.

**(3)** If a court determines that such determination is not in accordance with law, the court shall remand such proceedings to the Secretary with directions to--

**(A)** make such ruling as the court shall determine to be in accordance with law; or

**(B)** take such further proceedings as, in the opinion of the court, the law requires.